OMAHA & REPUBLICAN VALLEY RAILWAY COMPANY
v. GEORGE E. BRADY.

FILED JANUARY 16, 1894.    No. 4437.

1. **Railroad Companies:** STREET CROSSINGS: NEGLIGENCE. By the statute, railroad companies are given the right to lay their tracks in and across the streets of the municipalities of this state; and this right carries with it the corresponding duty on

their part to construct and maintain at all times proper crossings on the streets intersected at grade by their main and side tracks, and neglect so to do would be evidence of negligence which would render the railroad company liable for an injury occurring by reason thereof.

2. ——: NEGLIGENCE: FLAGMAN: QUESTION FOR JURY. In the absence of a municipal ordinance and of express statutory requirements on the subject, whether a railroad company is guilty of negligence in not maintaining a flagman, or some other equally safe and efficacious instrumentality at a given street crossing, is a question of fact for the jury to determine from the circumstances and evidence in the particular case.

3. ——: NOISE FROM MANAGEMENT OF TRAIN: EVIDENCE OF NEGLIGENCE. Railroads cannot be operated without noise; and if teams are frightened by the usual noise arising from a prudent and proper management of a train or engine, the railroad company is not liable for an injury resulting from such noise; and whether the noise complained of resulted from a prudent operation of the railroad or its appliances, is a question to be determined from the circumstances and other evidence in the case. That the noise complained of was unnecessarily made, is not of itself evidence that its making was negligence. To be evidence of negligence the noise must have been made under such circumstances and surroundings as to time, place, and the situation of the parties, as to show a neglect to exercise that degree of care which a reasonable man would have exercised under the circumstances.

4. Issues as to the existence of negligence and contributory negligence, and as to the proximate cause of an injury, are for the jury to determine, when the evidence as to the facts is conflicting and where different minds might reasonably draw different inferences as to these questions from the facts established. *American Water-Works Co. v. Dougherty*, 37 Neb., 373, followed.

5. The opinion of a medical expert may be based (1) on his acquaintance with the party whose condition is under investigation; (2) upon a medical examination of him which he has made; or (3) upon a hypothetical case stated to the expert in court.

6. Examination of Medical Experts: HYPOTHETICAL QUESTIONS. Some latitude must necessarily be given in an examination of medical experts and in the propounding of hypothetical questions, the better to enable the jury to pass upon the question submitted to them. It is the privilege of counsel in such cases

to assume, within the limits of the evidence, any state of facts which he claims the evidence justifies, and have the opinion of experts upon the facts thus assumed.

7. The argument of counsel to the jury should be limited to the facts in evidence and the reasonable inferences deducible therefrom. Counsel charged with the responsibility of the conduct of a case has certain rights as well as duties in the premises. He must use all honorable means to protect his client's interests. He must act honorably and fairly with the court, opposing counsel and the jury; but he may of right in his argument make such comment on the conduct and credibility of witnesses or parties to the suit as the evidence warrants.

8. In order to constitute champerty the contract between the attorney and his client must not only provide that the attorney shall have a part of the money or thing recovered in the action, but it must also provide that the attorney shall at his own expense support the suit, be responsible for the costs, and take all the risks of the litigation.

9. Champerty. A railroad company sued for damages, alleged to have been sustained by plaintiff through its negligence, cannot interpose as a defense that the suit is being carried on by virtue of a champertous agreement between plaintiff and his counsel; this is a defense available only, if at all, to the plaintiff in a suit against him on the contract.

10. Negligence: Instructions. The existence of negligence should be proved and passed upon by the jury as any other fact. It is improper for a trial court to state to the jury a circumstance or group of circumstances as to which there has been evidence on the trial, and instruct that such fact or group of facts amounts to negligence. At most, the jury should be instructed that such circumstances, if established by a preponderance of the evidence, are proper to be considered in determining the existence of negligence. *Missouri P. R. Co. v. Baier*, 37 Neb., 235 followed.

11. Railroad Companies: Negligence: Personal Injuries: Evidence: Damages. June 27, 1888, Brady was injured through the negligence of the railroad company. No bones were broken and no injury was visible. He was not confined to his bed until July 1889, and in the meantime worked at hauling brick and dirt and indulged some in athletic sports. In the summer of 1889 he was seriously sick with inflammation of the lining membrane of the chest. In March, 1890, he sued the railroad company for damages, alleging that the injury of June 27, 1888, was permanent. At the time of the trial he was suffering from

a mortal disease, probably consumption. The jury found his condition at the time of the trial was the result of the injury he received June 27, 1888. *Held,* That for this verdict to stand it must have for support competent evidence that Brady's condition at the time of the trial was the probable and reasonable result of the injury received June 27, 1888, and that evidence that his present condition was possibly the result of said injury, was not sufficient.

ERROR from the district court of Madison county. Tried below before POWERS, J.

The opinion contains a statement of the case.

*J. M. Thurston, W. R. Kelly,* and *E. P. Smith,* for plaintiff in error:

When the evidence given at the trial, with all the inferences which the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant. (*Schofield v. Chicago & St. P. R. Co.,* 114 U. S., 618; *Parks v. Ross,* 11 How. [U. S.], 372; *Richardson v. Boston,* 19 How. [U. S.], 269; *Randall v. Baltimore & O. R. Co.,* 109 U. S., 478; *Furlong v. Garrett,* 44 Wis., 111; *Jones v. Chicago & N. W. R. Co.,* 49 Wis., 352; *Seefeld v. Chicago, M. & St. P. R. Co.,* 70 Wis., 216; *Atchison & N. R. Co. v. Loree,* 4 Neb., 446; *State Bank of Crete v. Smith,* 29 Neb., 434.)

There is no statute requiring a flagman, and the judiciary cannot establish police regulations on their own judgment where the legislature has apparently considered none essential. (*Hass v. Grand Rapids & I. R. Co.,* 47 Mich., 401; *Peck v. Michigan C. R. Co.,* 19 Am. & Eng. R. Cases [Mich.], 257.)

Slight want of ordinary care on plaintiff's part will defeat his recovery, however gross the defendant's negligence may have been, provided it was not willful and malicious.

Under the testimony the court should have directed a verdict for the defendant. (*Randall v. Northwestern Telegraph Co.*, 54 Wis., 142; Beach, Contributory Negligence, sec. 162; *Louisville & N. R. Co. v. Schmidt*, 8 Am. & Eng. R. Cases [Ind.], 248; *McQuillikin v. Central Pac. R. Co.*, 2 Pac. Rep. [Cal.], 46 ; *Kelly v. Pennsylvania R. Co.*, 8 Atl. Rep. [Pa.], 856 ; *Dunning v. Bond*, 38 Fed. Rep., 813; *Freeman v. Duluth, S. S. & A. R. Co.*, 41 N. W. Rep. [Mich.], 875; *Rigler v. Charlotte, C. & A. R. Co.*, 26 Am. & Eng. R. Cases [N. Car.], 386 ; *Salter v. Utica & B. R. R. Co.*, 75 N. Y., 273; *Weyl v. Chicago, M. & St. P. R. Co.*, 40 Minn., 353; *Rhoades v. Chicago & G. T. R. Co.*, 58 Mich., 266; *Thompson v. New York C. & H. R. R. Co.*, 33 Hun [N. Y.], 16 ; *Heffinger v. Minneapolis, L. & M. R. Co.*, 45 N. W. Rep. [Minn.], 1131.) It is negligence to unnecessarily drive horses known to be easily frightened in the vicinity of trains emitting steam and making the usual noise incident to their operation. (*Pittsburgh Southern R. Co. v. Taylor*, 104 Pa. St., 306; *Philadelphia, W. & B. R. Co. v. Stinger*, 78 Pa. St., 219; *Cosgrove v. New York C. & H. R. R. Co.*, 6 Am. & Eng. R. Cases [N. Y.], 35 ; *Rhoades v. Chicago & G. T. R. Co.*, 25 N. W. Rep. [Mich.], 182; *Campbell v. New York C. & H. R. R. Co.*, 51 Hun [N. Y.], 642; *Stringer v. Frost*, 19 N. E. Rep. [Ind.], 331.)

The book should have been admitted in evidence. (*Van Every v. Fitzgerald*, 21 Neb., 41; *Schuyler Nat. Bank v. Bollong*, 24 Neb., 823; *Field v. Farrington*, 10 Wall. [U. S.], 141; *Xenia Bank v. Stewart*, 114 U. S., 230; *Randall v. Northwestern Telegraph Co.*, 54 Wis., 143; *Smith v. Schulenberg*, 34 Wis., 41.)

The jury should in every case distinctly understand what are the exact facts upon which experts base their opinions. The admission of testimony founded partially upon their memory of plaintiff's evidence was erroneous. (*Luning v. State*, 2 Pinney [Wis.], 215 ; *Bennett v. State*, 57 Wis., 83;

*Hunt v. Lowell Gas Light Co.*, 8 Allen [Mass.], 169; *Kempsey v. McGinniss*, 21 Mich., 123; *Woodbury v. Obear*, 7 Gray [Mass.], 467; *Kreuziger v. Chicago & N. W. R. Co.*, 73 Wis., 164; *Heald v. Thing*, 45 Me., 392; *Cincinnati & Firemen's Mutual Ins. Co. v. May*, 20 O., 224; *O'Leary v. Iskey*, 12 Neb., 136; *Morrill v. Tegarden*, 19 Neb., 536.)

The verdict should be set aside on account of remarks, unsustained by any testimony, made by the plaintiff's attorneys in addressing the jury, and calculated and intended to affect the verdict. (*Brown v. Swineford*, 44 Wis., 292; *Tucker v. Henniker*, 41 N. H., 317; *State v. Smith*, 75 N. Car., 306; *Ferguson v. State*, 49 Ind., 33; *Hennies v. Vogel*, 7 Cent. L. J. [Ill.], 18; *Coble v. Coble*, 79 N. Car., 589; *Long v. State*, 56 Ind., 186; *Rudolph v. Landwerlen*, 92 Ind., 34; *Hall v. Wolf*, 61 Ia., 559; *Whitsett v. Chicago, R. I. & P. R. Co.*, 67 Ia., 130; *Baker v. Madison*, 62 Wis., 137; *Hanawalt v. State*, 64 Wis., 84; *Sasse v. State*, 68 Wis., 530; *Commonwealth v. Scott*, 123 Mass., 239; *Hatch v. State*, 8 Tex. App., 416; *Chicago & A. R. Co. v. Bragonier*, 13 Brad. [Ill.], 467; *Rickabus v. Gott*, 51 Mich., 227; *Bedford v. Penny*, 25 N. W. Rep. [Mich.], 381; *People v. Quick*, 25 N. W. Rep. [Mich.], 302; *Cleveland Paper Co. v. Banks*, 15 Neb., 20; *Bradshaw v. State*, 19 Neb., 644; *Jacques v. Bridgeport Horse R. Co.*, 41 Conn., 61; *Galveston, Harrisburg & S. A. R. Co. v. Kutac*, 37 Am. & Eng. R. Cases [Tex.], 470; *Galveston, H. & H. R. Co. v. Cooper*, 70 Tex., 67; *McCormick v. Chicago, R. I. & P. R. Co.*, 47 Ia., 345; *Moore v. State*, 17 O. St., 526; *Baker v. City of Madison*, 62 Wis., 147; *State v. Balch*, 31 Kan., 465; *Bremer v. Green Bay R. Co.*, 61 Wis., 114; *Henry v. Sioux City & P. R. Co.*, 66 Ia., 52; *Bullis v. Drake*, 20 Neb., 167; *Bullard v. Boston & M. R. Co.*, 5 Atl. Rep. [N. H.], 838; *Dougherty v. Welch*, 53 Conn., 558; *Kreuzinger v. Chicago & N. W. R. Co.*, 73 Wis., 162; *Pennsylvania R. Co. v. Roy*, 102 U. S., 451.)

The agreement between the plaintiff and his counsel for payment by the former to the latter of one-half of the judgment as compensation is champertous and contrary to public policy. Any agreement to pay part of the sum recovered, whether by commission or otherwise, on consideration either of money advanced to maintain a suit, or services rendered, or information given, or evidence furnished, comes within the definition of champerty. (2 Parsons, Contracts [5th ed.], 766; *Stanley v. Jones*, 7 Bing. [Eng.], 369*; *Thurston v. Percival*, 1 Pick. [Mass.], 415; *Boardman v. Thompson*, 25 Ia., 487; *Cord v. Southwell*, 15 Wis., 231.)

When it appears from the evidence that a suit is prosecuted under a champertous agreement the court should at once dismiss it. (*Barker v. Barker*, 14 Wis., 154; *Webb v. Armstrong*, 5 Humph. [Tenn.], 379; *Morrison v. Deadrick*, 10 Humph. [Tenn.], 342; *Hunt v. Lyle*, 8 Yerg. [Tenn.], 142.)

There was no proof that the damage, past or prospective, was the probable result of the accident, but only the possible result. This will not do. There must be facts laid before the jury from which they may say, not that it is the possible, but the probable result. (*White v. Milwaukee City R. Co.*, 61 Wis., 536; *Abbot v. Tolliver*, 71 Wis., 64; *Strohm v. New York, L. E. & W. R. Co.*, 96 N. Y., 305; *Gibbons v. Wisconsin V. R. Co.*, 58 Wis., 341.)

*Wigton & Whitham, contra:*

The court did not err in overruling the motion to instruct the jury, at the close of plaintiff's testimony, to find for defendant. This the court may do only when plaintiff has failed to introduce evidence tending to sustain each material allegation of his petition; and, in determining whether plaintiff has so failed, let us remember, as this court has repeatedly held, that "by the interposition of the motion the defendant admitted not only the truth of the evidence,

7

but the existence of all the facts which the evidence conduces to prove as well as inferences to be ·drawn from it. The only question is whether all the material facts alleged in the petition have been supported by some evidence, however slight. It matters not how slight this evidence may have been, if any was produced the motion should have been overruled, because it is the right of a party to have the weight and sufficiency of his testimony passed upon by the jury." Plaintiff not only produced some evidence, but established, beyond question, that defendant was negligent in not keeping in good repair good and sufficient crossings. That the letting off of steam without warning was the direct cause of plaintiff's team taking fright and running is positively sworn to. The questions of negligence and contributory negligence were for the jury. (*Smith v. Sioux City & P. R. Co.*, 15 Neb., 586; *Johnson v. Missouri P. R. Co.*, 18 Neb., 696; *Byrd v. Blessing*, 11 O. St., 362; 1 Thompson, Negligence, p. 24; *Hart v. Chicago, R. I. & P. R. Co.*, 9 N. W. Rep. [Ia.], 116; *Hart v. Chicago, R. I. & P. R. Co.*, 7 N. W. Rep. [Ia.], 347; *Pennsylvania R. Co. v. Barnett*, 59 Pa. St., 259; *Gordon v. Boston & M. R. Co.*, 58 N. H., 396; *Toledo, W. & W. R. Co. v. Harmon*, 47 Ill., 298; *Manchester, S. J. & A. R. Co. v. Fullarton*, 14 C. B. [Eng.], 53; *Culp v. Atchison & N. R. Co.* 17 Kan., 475; *Andrews v. Mason City & Ft. D. R. Co.*, 42 N. W. Rep. [Ia.], 42; *Walker v. Boston & M. R. Co.*, 13 Atl. Rep. [N. H.], 649; *City of Plattsmouth v. Mitchell*, 20 Neb., 231; *Stringer v. Frost*, 19 N. E. Rep. [Ind.], 331; *Burnett v. Burlington & M. R. R. Co.*, 16 Neb., 336.)

The ruling upon the objections to the testimony of the experts was without error. (*Hunt v. Lowell Gas Light Co.*, 8 Allen [Mass.], 169; *Wright v. Hardy*, 22 Wis., 348; *Getchell v. Hill*, 21 Minn., 464; *Negroes v. Townshend*, 9 Md., 445; *Gates v. Fleischer*, 30 N. W. Rep. [Wis.], 674.)

In the argument of a cause error will lie only from the action of the court, and not from the language of counsel.

(*Bradshaw v. State*, 17 Neb., 152; *McLain v. State*, 18 Neb., 163; *Bohanan v. State*, 18 Neb., 79; *Bullis v. Drake*, 20 Neb., 172.)

The agreement between the plaintiff below and his attorneys is valid and not champertous. (*Blaisdell v. Ahern*, 11 N. E. Rep. [Mass.], 681; *Courtright v. Burnes*, 13 Fed. Rep., 323, note; *Phillips v. South Park Com'rs*, 10 N. E. Rep. [Ill.], 230; *Winslow v. Central I. R. Co.*, 32 N. W. Rep. [Ia.], 330; *Aultman v. Waddle*, 19 Pac. Rep. [Kan.], 730.)   Even if it were champertous, the defendant, not being a party to the contract, and this not being an action on the contract, could not raise the question or be relieved of any liability in this action because of it. (*Courtright v. Burnes*, 13 Fed. Rep., 317; *Gage v. Downey*, 19 Pac. Rep. [Cal.], 120.)

RAGAN, C.

George E. Brady sued the Omaha & Republican Valley Railroad Company in the district court of Madison county for damages, for an injury which he alleges he received by reason of the railroad company's negligence on the 27th day of June, 1888, while he was in the act of crossing the railroad company's tracks in the city of Norfolk with his wagon and team.   He alleged in his petition that at the time of his injury Norfolk avenue . ran east and west through, and was the principal street in, said city, and that the railroad company's main and side tracks crossed said avenue at grade in a northeasterly and southwesterly direction.   The grounds of negligence charged against the railroad company, are three: (*a.*) That the railroad company had caused the crossings at the intersection of said avenue and said main and side tracks to become and remain out of repair by removing the planking from between the rails of said tracks at said crossings.   (*b.*) That the railroad company had no flagman or other person at said crossing to give warning.   (*c.*) That plaintiff was engaged in hauling

dirt with his team of horses and wagon upon said avenue, and while so engaged in driving his said team and wagon along and upon said avenue going west, when about to cross said railroad and side tracks upon said avenue, the railroad company, by its servants and agents, negligently, wrongfully, and unlawfully, suddenly and without warning to plaintiff, caused and permitted steam to discharge in great volume, noise, and with hissing sound while said engine was standing or moving slowly on defendant's said railroad near the north margin of said avenue and public road and near the plaintiff's said team, which took fright thereat, ran away, across and over said railroad and side tracks, and the dirt bed or plank floor of said wagon, upon which plaintiff was riding, became loose and fell to the ground, and plaintiff was struck and thrown by reason thereof from and off of said wagon down under the same and was run over by said wagon and the wheels thereof. The defense of the railroad company—aside from admitting its corporate character, location of Norfolk avenue, and its intersection by the main and side tracks of the railroad—was substantially a general denial of the averments of the petition and a plea of contributory negligence upon the part of Brady. Brady had a verdict and judgment, and the railroad company brings the case here for review, assigning numerous errors, of which we notice eight.

1. That the evidence does not establish any negligence on the part of the railroad company which caused Brady's injury.

(a.) The condition of the crossing. The evidence discloses that the railroad company's track and side tracks cross Norfolk avenue as alleged in the petition; that said avenue was one of, if not the main thoroughfare of said city; that it was much used both by the country people and the residents of the city; that some time prior to Brady's accident the railroad company had removed the

planking, or a part of it, from between the rails of their tracks at said crossings, and at the date of the casualty the said crossings were not in good condition; that Brady, on the day of his injury, was engaged in hauling dirt from a point west of these crossings and passed over them with his wagon; that while he was driving west for a load of dirt, sitting on the dirt boards of his wagon, and while about to pass over the crossing of Norfolk avenue and the main track, his horses became frightened at the noise made by escaping steam from the locomotive engine of the railroad company on said main track, ran away and over the crossings of the said tracks; the chucking and striking of the wheels of his wagon against and between said tracks loosened the boards on his wagon, causing an end of one of them to fall to the ground and the other end to strike Brady on his side and to knock him off his wagon, one wheel of which passed over his body. It does not clearly appear whether his hurt was caused by being struck by the board or by the wagon wheel passing over him. I am not aware of any statute in this state which expressly provides that railroad companies shall construct and maintain in good order street crossings at the grade intersections of their railroad and side tracks with the streets of the cities of this state; but railroad companies are by the statutes given the right to lay their tracks in and across the streets of the municipalities of the state, and this right carries with it the corresponding duty on the part of the railroad companies to construct and maintain at all times proper crossings on the streets intersected at grade by their tracks and side tracks; and if an injury is caused by reason of their neglect to do either, they are liable therefor. (2 Wood, Railway Law, p. 958; *Worster v. Forty-second Street & G. S. F. R. Co.,* 50 N. Y., 203.) There is sufficient competent evidence in the record to sustain the jury's verdict to the extent that Brady was injured through the negligence of the railroad company in failing to keep in

good repair the crossings at the intersection of the railroad and side tracks with Norfolk avenue.

(b.) The flagman at crossings. The evidence on the trial was conflicting as to whether there was a flagman at the crossing at the time of the accident. For the purposes of this opinion we shall assume there was none. There is no statute in this state which expressly makes it the duty of a railroad company to keep a flagman at the crossings of city streets, nor is there anything in the record showing that such duty was enjoined on the railroad company by the ordinances of the city of Norfolk. No rule can be laid down by the courts in such matters that might not work injustice. It certainly is not the duty of railroad companies to maintain a flagman or watchman or gates at all crossings of all streets; and on the other hand it is their duty to so use their property and franchises as not to unnecessarily injure others. In the absence of a city ordinance and all statutory requirements on the subject, whether a railroad company is guilty of negligence in not maintaining a flagman or some other equally safe and efficacious instrumentality at a particular street crossing, is a question of fact for the jury or trial court to determine from all the circumstances of the particular case; and while there is no doubt it was the duty of the railroad company to maintain a flagman or some other equally safe instrumentality at this crossing to warn persons about to come on said crossing of approaching danger, yet the neglect of this duty by the railroad company in this instance neither produced nor contributed to Brady's injury; and if this verdict depended for its support on such default, it could not stand. The noise of escaping steam which frightened Brady's horses was produced by the engineer opening the cylinder cocks of his engine, at that time north of the avenue and not approaching or about to approach the avenue, but backing or about to back away from the crossing. Counsel for Brady argue, if we understand them, that the railroad company

should have, by a flagman, or otherwise, at the crossing, given notice to Brady that this noise was about to be made, and that the failure of the railroad company to do so was evidence of negligence to go to the jury. The duty of a flagman or watchman at a street crossing is, as we understand it, to warn persons about to go on the crossing of approaching trains, cars, or engines, *i. e.,* danger. How could a flagman at this crossing have known that this engineer was about to open the valves of his engine? And a rule of law that made it evidence of negligence against a railroad company for it not to apprise persons about to come on the crossing that an engine or other machinery on the track was about to cause a noise, usual and incident in the operation of said railroad, would be both unjust and oppressive. We are aware that such a rule was laid down by the supreme court of Iowa in *Hart v. Chicago, R. I. & P. R. Co.,* 56 Ia., 166; but with the highest respect for that tribunal, we cannot follow its conclusions in that case on this point.

(c.) The escape of steam. It appears from the evidence that while Brady's team was on or nearly over the crossing of the main track, a locomotive engine headed south on said main track some fifty feet north of Brady's team was either backing slowly or about to back away from the crossing, and while the team and engine were in this situation, the engineer permitted the steam to escape from the cylinder cocks of his engine, the noise of which frightened Brady's team and caused it to run away; that the noise made was not extremely loud, nor was it an unusual, hideous, or frightful one; that the engine had been taken a short time before from the roundhouse, where it had stood the previous night; that the employes of the railroad company had been doing some switching with it in making up a train that was about to go out, and at the time of the "letting off steam" the engine and train were backing or about to back up to the station; that as an engine cools

down the steam condenses in the cylinders, and it is necessary for the protection of the engine to force the water formed by this condensation out of the cylinders before sending the engine out on the road; that this is done by opening the valves in the cylinder; that from the time the engine came out of its stall to the moment of the accident, sufficient time had elapsed for ejecting the condensed steam from the cylinders; that the act of " letting off steam " at the time it was done was not necessary for the proper operation or protection of the engine; that the train had just backed over the crossing from a point south of the avenue; that this avenue was much traveled, and others besides Brady with teams were on it, but not in the immediate vicinity of the crossing at the time the train backed over it. That the engineer, when he passed the crossing, observed Brady or others on the street and near the crossing, and that at the time he opened the valves of his engine he was aware of Brady's presence on or near the crossing, are not established by the testimony. These facts were competent evidence to go to the jury, as they were part of the things done; but they were not, under all the facts and circumstances in this case, evidence that the act of unnecessarily " letting off steam" was a negligent one. If the record disclosed that the engineer in charge of the train, at the time he opened the values of his engine, was aware of the presence of Brady, or other persons with teams, at the crossing, then these facts would have been evidence of negligence for a jury's consideration. If the facts, circumstances, and situation of the parties had been such at the time this steam escaped as to make it the duty of the engineer to be aware of Brady's presence, then the engineer's act of opening the valves would have been evidence of negligence for the jury's consideration. The evidence does not show that the engineer, at the time, was aware of Brady's presence, but that immediately prior to the escaping of this steam the engine had been backing

north towards and across Norfolk avenue.   During this
time it was the duty of the engineer to keep a lookout in
the direction towards which his engine was moving.
When his engine passed the Norfolk avenue crossing
Brady was a hundred feet away, and the engineer was un-
der no obligations to observe him or his conduct at that
distance.   If at the time the engine passed the crossing at
Norfolk avenue, Brady and his team had been in the im-
mediate vicinity of the crossing, the facts might have been
competent for the jury.   At the very moment the engineer
permitted the escaping of the steam his engine was either
moving, or about to move, north away from the crossing,
and in either case it was the engineer's duty to be then on
the lookout for obstructions on the track in the direction
his engine was moving or about to move; and if he was
not so engaged, that fact would be evidence of negligence.
Suppose at the time the steam escaped, the engineer had
been looking toward the crossing he had just passed, and
his train had struck and injured a child on the track.
Could this company escape liability therefor by saying that
the engineer did not see the child in time to stop his train
because at the moment of the accident he was looking back
toward the point from which his train was receding?   We
think no lawyer will contend that the railroad company
could escape liability on any such grounds.   Railroads
cannot be operated without noise, and if teams are
frightened by the usual noise arising from a prudent and
proper management of a train or engine, the railroad com-
pany is not liable for an injury resulting from such noise.
The making of an unnecessary noise by a railroad com-
pany, as, in this case, the escaping of steam, is not of itself
evidence of negligence.   It may or may not be.   To be neg-
ligence, the noise must have been made under such circum-
stances and surroundings as to time, place, and situation
of the parties as to establish a neglect to exercise that de-
gree of care which a reasonable man would have exercised

under the circumstances. If this verdict depended for its support on the alleged negligence of the railroad company's engineer in opening the valves of the engine and unnecessarily permitting the escape of the steam therefrom, it could not stand ; but the verdict does not rest alone on such alleged act of negligence; and the instruction of the district court by which the jury was permitted to consider the unnecessary escape of steam, and the noise made thereby, as evidence of negligence, though erroneous, was without prejudice to the railroad company, as the proximate cause of Brady's injury, as proved, was the bad condition of the railroad and switch-track crossings of Norfolk avenue; and there is ample evidence to sustain the jury's finding that Brady was injured by the negligence of the railroad company, after excluding all the evidence on the subject of escaping steam.

2. That Brady's injury was the result of his contributory negligence.

The evidence shows that Brady knew the planks had been removed from between the rails and that the crossings were out of repair; that his horses would become frightened if it, the railroad company, "let off steam ;" that he saw ahead of him the train backing slowly north across the avenue on which he was driving, while he was 100 feet from the crossing; that he took no special precautions for his safety when approaching the crossing, but sat on the boards on his wagon, with his feet hanging at the side and holding his lines as he ordinarily did when approaching a crossing. In *Foxworthy v. City of Hastings*, 23 Neb., 777, it is said that negligence is doing something which a prudent man under the circumstances would not do. Now, did Brady, in driving on this crossing at the time, in view of the situation of the engine, his knowledge of the disposition of his team, and the condition of the crossings, do something which a prudent and reasonable man would not have done? Different minds might honestly answer the

question differently, and the question is therefore one for the jury. ( *City of Lincoln v. Gillilan,* 18 Neb., 114; *Orleans v. Perry,* 24 Neb., 831 ; *Brown v. Brooks,* 55 N. W. Rep. [Wis.], 395; *Missouri P. R. Co. v. Baier,* 37 Neb., 235; *American Water-Works Co. v. Dougherty,* 37 Neb., 373.)

3. That the court erred in overruling objections made to hypothetical questions propounded to experts by Brady's counsel.

Brady brought this suit some twenty months after he was hurt. During the summer of 1889 he was sick and attended by the physicians examined as experts, and was also examined at the trial by the physicians in the presence of the jury; and it appears from the evidence that Brady was then afflicted with a mortal disease, probably consumption. Dr. Hagey, one of the physicians, after testifying that he visited Brady professionally in the summer of 1889 and had heard his evidence, was asked by Brady's counsel this question: "Q. State whether the condition in which you found him at that time—summer of 1889—might be the result of an injury received in June, 1888." Counsel for the railroad company interposed to this question the following : "Objected to by the defendant, as improper, as it is founded partially upon the memory of the witness as to what testimony was given by the plaintiff to the jury." The trial court overruled the objection and the railroad company excepted. Dr. Salter, one of the physicians who had attended Brady during his sickness in 1889, and examined him at the trial, was asked by Brady's counsel this question: "Q. Now, you may state whether, in your judgment, his present condition may be the result of an injury which the plaintiff received as testified to by him on June 27, 1888, taking into account his entire testimony as to his physical condition since that time, providing such testimony and providing such facts as are testified to by him are true." To this there was the same objection, same ruling of the trial court and exception taken by the railroad company.

It will be observed that the objection is "that the witnesses remembered only part of Brady's evidence." We have no means of knowing how this was. The record is silent on the subject. The expert was not examined, before answering, by objecting counsel as to how much of Brady's evidence he had heard or remembered. The objection itself was not on its face a valid one. The opinion of a medical expert may be based (1) on his acquaintance with the party who is under investigation; (2) on a medical examination of him which he has made; (3) and upon a hypothetical case stated to the expert in court. (Lawson, Expert and Opinion Evidence, 144.) "Some latitude must necessarily be given in the examination of medical experts and in the propounding of hypothetical questions for their opinions, the better to enable the jury to pass upon the questions submitted to them. The opinion is the opinion of the expert, and if the facts are found by the jury as the counsel by his questions assumes them to be, the opinion may have some weight, otherwise not. It is the privilege of the counsel in such cases to assume, within the limits of the evidence, any state of facts which he claims the evidence justifies, and have the opinion of experts upon the facts thus assumed." (*Filer v. New York C. R. Co.*, 49 N. Y., 42.) In *Wright v. Hardy*, 22 Wis., 348, the following hypothetical question was approved: "Suppose his statement relative to the amputation and its subsequent treatment to be truthful, was or was not the amputation well performed? Was the subsequent treatment of the patient proper or improper?" In *Hunt v. Lowell Gas Light Co.*, 8. Allen [Mass.], 169, this hypothetical question was approved: "Having heard the evidence, and assuming the statements made by the plaintiffs to be true, what in your opinion was their sickness, and do you see any adequate cause for the same?" Also in *Getchell v. Hill*, 21 Minn., 464, this hypothetical question was approved: "Supposing all these facts you have heard testified to are

true, what is your opinion?" The hypothetical questions objected to were not very happily framed. They called for the opinions of experts as to possibilities instead of probabilities; but they were not objected to on that ground, and the court did not err in overruling the objections made.

4. That the court erred in refusing to admit in evidence a memorandum book.

Brady testified that from the time of the runaway until the time of the trial he had never been a well man and had done no labor of any consequence. A witness for the railroad company, one Gerecke, the manager of a brick and tile company in Norfolk, testified that from August 20, 1888, to October of the same year, and in April and June of 1889, Brady was engaged in hauling brick from the yard of Gerecke. Witness kept a memorandum book in which he entered Brady's name at the time he received brick and the number of loads hauled. Brady also signed his name in this book as a receipt for the brick received. The exclusion of this book was not prejudicial error. The question at issue was not whether Brady signed his name in this book, but whether he hauled and handled the brick. The book was not the best evidence to prove the fact of Brady's performing labor. That was proved by Gerecke and others, who testified that they saw him loading and hauling brick, and their statements were the best evidence of the facts sought to be proved.

5. That the court erred in ruling that certain statements made by Brady's counsel in his argument were proper deductions from the evidence.

The statement of counsel was as follows: "I say with their wealth and their influence which they possess, and I say that with Ransom and the balance of them looking up and searching for evidence that they have brought against us, that their agents themselves knew they were swearing to a state of facts that never could have existed, never did exist, and could not well have existed." Upon objection

made by counsel for the railroad company to these remarks the trial court said: "I think the gentleman has a right to draw his own conclusions from the evidence." To this ruling of the court counsel for the railroad company took exception. The question is, was this statement a fair deduction or conclusion from the evidence; or, was it so unwarranted by anything in the testimony as to be prejudicial error, and was the trial court wrong in holding that the evidence in the case warranted counsel's conclusions?

The witness Ransom testified that he was in the employ of the railroad company; that his business was to look up evidence for the company in cases like the one on trial; that he spent half his time at this business; and that part of his visits to Norfolk had been for the purpose of looking up evidence in the case on trial.

Joe Flynn, another witness for the railroad company, said his occupation was anything he could get to do; that he had been figuring around at a little of everything the past season; that he could not say he was in the employ of the railroad company; "the way, my understanding is this: Of course I went around, and what time I used for them they agreed to pay me my wages. Of course, I was under no written agreement of employment or anything of the kind. * * * If I happened to meet any one I would go around with him to Mr. Ransom." * * *

Q. They agreed to pay you for whatever you did for them?

A. I will answer it just as I understood it. I was not in their employ at all. If I was under any expense or lost any of my time they were to pay me for it. There was nothing said about my coming to work for them or about being in their employ at all, but in case that I lost a day in running around they were willing to pay me for it. I was not in their employ for any certain time.

Q. Did they not agree to give you $50 for your work in that case? (*Clarke v. Railroad Co.*, tried just before this.)

A. While they did not agree to do it, but my fees and expenses amounted to that; that was what my fees and expenses amounted to.

Q. Is it not true, Joe, that you are now working for them in the same way; that is, in this case?

A. There has nothing been said about it at all.

Q. Not at all?

A. No, sir.

Q. Is it not true that you have been detailed to get their witnesses for them and to talk with them?

A. Yes, sir; I have talked with them.

Q. Is it not true that you have been assisting Mr. Weatherby and the others in getting witnesses for this trial?

A. I cannot say particularly.

Q. Well, you expect to be paid for your work?

A. I do not know that I have done any work.

Q. You expect to get paid for your work, what you have done?

A. I have got my fees.

Q. You have got your fees; you have got your pay?

A. Yes, sir; I demanded them as I went.

We are very clear that counsel's remarks were warranted by the evidence, and that the court was not in error in his ruling. The argument of counsel in addressing the jury should be limited to the facts in evidence and to the fair inferences to be drawn therefrom, and counsel should be allowed in his argument to draw all reasonable and fair deductions from the evidence. A lawyer charged with the responsibility of the conduct of a case has certain rights as well as duties in the premises. On the one hand he must use all honorable means to protect his client's interests. He must act honorably and fairly with the court, opposing counsel, and the jury; but he should not be restrained in his argument from making such comment on the conduct and credibility of witnesses or parties to the suit as is justified by the evidence.

6. That this suit is prosecuted under a champertous agreement between Brady and his counsel, and that the court erred in not so holding and dismissing the suit. The contract referred to is as follows: " It is hereby agreed by and between Geo. E. Brady and Wigton & Whitham that said Wigton & Whitham act as attorneys for said Geo. E. Brady, and shall do and perform such legal work and services as shall be necessary and proper in the prosecution and collection of a claim of said Geo. E. Brady against the Omaha & Republican Valley Railway Company for personal injuries received by said Brady on or about June 27, 1888; and in consideration of said agreement on the part of Wigton & Whitham, said Brady agrees to give the management and trial of the case about to be begun for the collection of said claim to the said Wigton & Whitham as his attorneys, and to pay an amount equal to one-half of the amount recovered from said company, either by compromise or judgment."

The text writers are not entirely agreed in their definitions of the term " champerty." Lord Coke defines the term thus: " To maintain to have part of the land, or anything out of the land, or part of the debt, or other thing in plea or suit." (Coke's Litt., 368b.) Sergeant Hawkins defines the term thus: " The unlawful maintenance of a suit in consideration of some bargain to have part of the thing in dispute or some profit out of it." (1 Hawkins, P. C. [6th ed.], 645.) Mr. Chitty defines it thus: "Champerty is the purchasing a suit or right of action of another person; or rather, it is a bargain with a plaintiff or defendant, to divide the land or other matter sued for, between them, if they prevail at law; whereupon the champertee is to carry on the party's suit at his own expense." (2 Chit., Cont. [11th Am. ed.], 996.) Mr. Blackstone defines it thus: "A bargain with the plaintiff or defendant *campum partire*, to divide the land or other matter sued for between them if they prevail at law; whereupon the cham-

pertor is to carry on the party's suit at his own expense."
(4 Bl. Com., 135.)

Champerty is not a criminal offense, nor is a champertous
contract illegal under our statutes; and if this contract is
champertous and voidable, it is because it is contrary to
public policy to enforce it.    Adopting the definition of
champerty given by Mr. Blackstone, and interpreted in the
light and language of that definition, is this contract
champertous?    It will be observed that one of the essential
elements of the vice of champerty is that the champertor
must carry on the litigation at his own expense.    There is
no such provision in the contract assailed here as champer-
tous.    Another element of the vice of champerty, as defined
above, is that the agreement must provide for the division
of the subject-matter of the suit, if successful, between the
parties to the champertous agreement.    This element is
also lacking in the contract under consideration.    The lan-
guage is: "To pay an amount equal to one-half of the
amount recovered."    It is not stipulated that Brady's
counsel shall have any certain part of the sum recovered,
but their compensation, if they are successful, is to be
measured by the amount of the recovery.

The courts are not in complete harmony as to what con-
tracts are champertous.    The weight of authority seems to
be that contracts between attorney and client by which the
attorney agrees, in consideration of having a part of the
thing recovered, to support the litigation at his own ex-
expense are champertous; but where the attorney does not
undertake to support the litigation at his own expense, but
simply agrees to render the ordinary services of an attor-
ney in consideration of receiving a part of the thing re-
covered, then the agreement is not champertous.    In
*Blaisdell v. Ahern*, 144 Mass., 393, the contract provided:
"Said counsel and attorney are to depend upon the con-
tingency of success for the fees for all services rendered in
the case,    *    *    *    and the counsel so employed shall, in

8

view of the uncertainty of the result in their payment, be entitled to very large and liberal fees, in no event to exceed fifty per cent of the amount collected by them." The client was to pay all costs. In an action by the attorney against the client to recover for his services the court held that the contract under which services were rendered was not void for champerty. In *Aultman v. Waddle*, 40 Kan., 195, certain judgment creditors assigned judgments which they owned to an attorney, agreeing with him that he should collect the judgments in his own name and retain fifty per cent of the amount realized for his fees, the creditors to pay all costs. The court held that the agreement was not champertous, as it did not relieve the creditors from paying the costs of the proceedings. To the same effect are also the following: *Wright v. Tebbitts*, 91 U. S., 252; *Winslow v. Central Iowa R. Co.*, 71 Ia., 197; *Phillips v. South Park Commissioners*, 119 Ill., 626.

From these authorities we conclude that in order to taint a contract with the vice of champerty, the agreement between the attorney and the client must provide not only that the attorney shall have a part of the money or thing recovered, but that he must also at his own expense support and carry on the suit and take all the risks of the litigation. The contract between Brady and his counsel is not within this rule, and therefore not champertous. It remains to be said on this point, however, that if this contract were champertous, that fact would not be a defense of which the railroad company could avail itself in this case. That would be a defense, if a defense, available only to Brady in a suit against him on the contract. (*Aultman v. Waddle*, 40 Kan., 195; *Courtright v. Burnes*, 13 Fed. Rep., 317.)

7. That the court erred in refusing to charge the jury as follows:

"1. Every person of ordinary intelligence is bound to know that a railroad crossing over a public highway, where .

cars are frequently passing, is a place of more than ordinary danger; and the law requires that they must exercise prudence, care, and caution to avoid any accident or collision therefrom; that in approaching such crossings it is their duty to both listen and to look for approaching trains. If plaintiff saw defendant's cars moving slowly over the crossing in time to have stopped his team until there should be no danger of frightening his horses from the noise or escaping steam of the cars, it was his duty to do so; and if, with plaintiff's knowledge, his horses, or either of them, were liable to be startled or become unmanageable on account of such noise or steam, then it would be negligence on his part to attempt to drive them across the track before the moving cars had reached such a distance that no danger therefrom could reasonably be apprehended.

"2. The principle that requires that a man shall use his ears and eyes for his precaution in approaching a railroad crossing equally requires that he shall use his faculties in the management of his team and thus keep out of danger. If you shall find from the evidence that the horses driven by plaintiff were, of his own knowledge, easily frightened by a locomotive or by the operation of cars, and that they were liable, if he attempted to cross the track, to be frightened or startled by the defendant's cars situate as they were, he did so at his own risk. The act becomes one of negligence, and he cannot recover. It makes no difference in such cases whether or not there was a flagman stationed at the crossing, because the only duty of a flagman is to give notice of the situation of the train. The plaintiff could see that for himself, and he had no right to rush into danger.

"3. If you shall find from the evidence that the plaintiff knew the position of the railroad track, the crossing and its condition, if it were out of order, and that trains were running frequently thereon; approached the crossing with full knowledge that the train was moving over the same, as shown by the testimony, but without stopping his team

until they had come so close upon the tracks that he was unable to stop them before getting upon the tracks, and, in consequence thereof, they ran away and he was injured, the plaintiff cannot recover in this action.

"4. If you shall find from the evidence that the plaintiff could have seen and did see the approaching train by looking in the direction of it before he reached the crossing, in time to have stopped his horses and avoided their being frightened by the operation of the locomotive, and omitted so to do, such omission was negligence, and you should find for the defendant; especially is this the case if you shall find from the evidence that the horses, or either of them, were easily frightened and had been frightened and run away at the same crossing prior to the accident, and that to the knowledge of the plaintiff."

These instructions were properly refused, for the reason that they in effect said to the jury that if Brady did thus and so, or if he omitted to do thus and so, then he was guilty of negligence. The court could tell the jury that an act or omission was or was not evidence for their consideration in determining whether Brady was guilty of negligence; but whether the evidence established negligence or no negligence was and is exclusively for the jury. *Orleans Village v. Perry*, 24 Neb., 831, was an action for damages resulting from a fall into an excavation in a sidewalk. The evidence showed that the plaintiff knew of the excavation; that he attempted to pass that way, and, remembering the defect, made an effort to pass around it; but by reason of misjudging the distance, he fell into the excavation and was injured. It was held that the question of his contributory negligence was for the jury to decide in view of the circumstances as shown by the evidence. In *Brown v. Brooks*, 55 N. W. Rep. [Wis.], 395, the defendants, who owned some hay about a mile from the plaintiff's stacks, in order to protect them from prairie fires, burned the stubble around them. The fire escaped and burned plaintiff's hay.

There had been fires raging in the vicinity for days, and plaintiff saw the fire which escaped from defendant's stack more than twenty-four hours before it reached his hay. He apprehended danger, but he did not burn nor mow the stubble around his stacks but attempted to haul his hay away. The court held that the question whether plaintiff used reasonable care to protect his hay was for the jury, and that it was error to charge that his failure to remove the stubble was not negligence. In *Missouri P. R. Co. v. Baier*, 37 Neb., 235, Commissioner RYAN, speaking to this point and for this court, said: "It is improper to state to the jury a circumstance or group of circumstances as to which there has been evidence on the trial, and instruct that such fact or group of facts amounts to negligence *per se*. At most, the jury should duly be instructed that such circumstances * * * are properly to be considered in determining the existence of negligence." In *American Water-Works Co. v. Dougherty*, 37 Neb., 373, IRVINE, C., speaking to this point and for this court, used this language: "Issues as to the existence of negligence and contributory negligence * * * are for the jury to determine, when the evidence as to the facts is conflicting, and where different minds might reasonably draw different inferences as to these questions from the facts established."

8. That the damages awarded Brady by the jury are excessive.

The verdict in this case was for $7,000. Without a doubt it is predicated on the finding of the jury that Brady had sustained a permanent injury. The trial of this cause occurred on the 1st day of May, 1890. At this time Brady's right lung, or the major portion of it, was, to use the language of the physician who testified in the case, "completely dead;" and it is evident from the record that Brady was extremely feeble and slowly dying, probably of consumption. Other than this no disability is shown. Whether this verdict is excessive must then be determined

by an answer to this question: "Was Brady's condition at the time of the trial the result of the hurt received June 27, 1888?" The jury evidently found that it was. It remains, then, to ascertain whether such finding is supported by competent evidence. Brady's evidence and that of the members of his family and his other witnesses was to the effect that when his team ran away he was struck on the side by a dump board, or part of one, and knocked off his wagon, one of its wheels running over his body; that prior to that time he was a sound, healthy man; that he had never been well since; had suffered more or less since with a pain in his side, bowels, and breast; and had since done no work of any consequence, and since the accident had been unable to work. On the other hand, the evidence is to the effect that Brady, from the date of the accident until July, 1889, continued his usual labor; that he worked at loading and hauling brick; hauling dirt for building a dike; that he participated in athletic sports, such as wrestling and handling dumb bells; that in July, 1889, he had a serious sickness; that he then complained of pain in his chest and bowels; that his disease was pleuritic—inflammation of the lining membrane of the chest; that Brady's family then claimed in his presence that his pleuritic trouble began in April, 1889, and that it was caused by Brady's throwing lead bricks; and this statement was not contradicted by any one.

For the purpose of showing that Brady's condition at the time of the trial was the result of his hurt in June, 1888, his counsel called Doctors Hagey, Tashjean, and Salter. Dr. Tashjean had examined Brady immediately after the runaway, and both he and Dr. Hagey had attended him during his illness in the summer of 1889; Dr. Salter had been treating Brady since February, 1890, and with the other two doctors had examined him at the trial. The following is the substance of their evidence to the point under consideration.

Q. State whether the condition in which you found him at the time (July, 1889) might be the result of an injury such as he testified he received in June, 1888.

A. It is possible. I do not say that it was. It is possible to have been from an injury such as he stated he had.

Q. Now you may state whether in your judgment his present condition may be the result of an injury which the plaintiff received, such as testified to by him, on June 27, 1888, taking into account his entire testimony as to his physical condition from that time until this, providing such testimony and such facts as testified to by him are true.

A. Am I to take into consideration the fact that he says that he did not work and the fact the other witnesses say that he did work? The difficulty that I see with the question is that there has been some evidence that he did work since that time, and he says that he did not work to any amount.

Q. No, sir; do not take that into consideration.

A. Then I say that it is possible.

Q. Would you say, in your judgment, that his condition, when you saw him in August, 1889, might be the result of an injury received on the side by something striking the side, or from a fall received about a year previous to that time?

A. It might be, but I do not say that it was.

Q. His condition at the time might be the result of such an injury?

A. I cannot say; it might be.

Q. State whether, in your judgment, his present condition, or the condition you saw him in a few weeks ago, might be the result of an injury received in the side in June, 1888.

A. Why, it might be.

Q. Now then, doctor, providing this patient of yours, Mr. Brady, had continually labored at his usual vocation as a laboring man for three or four years after the acci-

dent occurred in June, 1888, for a number of months, say
five or six or seven months almost continually, would you
from your diagnosis of the case at that time, in August or
July, 1889, say that his condition at that time could result
from an accident received in June, 1888?

A. I cannot say.   It might be, but I do not know.

Q. From your observation at the time of the examina-
tion in July or August, 1889, your first examination after
the accident, could you discover any necessary relation be-
tween the two?

A. Why, I could not say.

Q. You could not see any necessary connection?

A. I could not conscientiously say what the cause was.
I had not the observation to make the connection between
1888 and 1889.   Had I had charge of the case right along,
I could have told something; but I do not know.

No witness in this case testified that Brady's condition at
the time of trial, or his illness in 1889, was the result of
the hurt he received in June, 1888.   No witness even
ventured such an opinion.   Brady's own physicians shield
themselves behind possibilities and refuse to say that his
present condition is even probably the result of his injury
in June, 1888.   The jury then must have reached their
conclusion by inference.   In *Fry v. Dubuque & S. W. R.
Co.*, 45 Ia., 416, the evidence was that the injured limb was
in a fair way to recover permanently after the first injury,
and the witness would not say there was no chance for a
permanent recovery.   The court charged the jury: "You
will give her such damages as will fairly compensate her
for all past, present, or future physical suffering or an-
guish which is, has been, or may be caused by said injury."
The supreme court, on appeal, held this construction to be
erroneous, and laid down the rule as follows: "While
future physical suffering is a proper element of damages,
yet the damages should be limited to such as would result
with reasonable certainty from the injury complained of,

and should not be left to mere conjecture." In *Strohm v. New York, L. E. & W. R. Co.*, 96 N. Y., 305, the rule is thus laid down: "To entitle a plaintiff to recover present damages for apprehended future consequences, there must be such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury. Consequences which are contingent, speculative, or merely possible are not proper to be considered in estimating the damages, and may not be proved." In *Ohio & M. R. Co. v. Cosby*, 107 Ind., 32, it is said: "That an injury may possibly result in permanent disability, will not warrant the assessment of damages for a possible disability unless it is also reasonably certain to follow. That in order to justify the assessment of damages for future or permanent disability, it must appear that continued or permanent disability is reasonably certain to result from the injury complained of." In *Indianapolis, B. & W. R. Co. v. Birney*, 71 Ill., 391, the rule is thus stated: "Where speculation or conjecture has to be resorted to, for the purpose of determining whether the injury results from the wrongful act or from some other cause, damages cannot be allowed for such injury." In *Filer v. New York C. R. Co.*, 49 N. Y., 42, it is said: "The limit in respect to future damages is that they must be such as it is reasonably certain will inevitably and necessarily result from the injury." In *White v. Milwaukee City R. Co.*, 61 Wis., 536, the rule is thus stated: "To justify the jury in assessing damages for future or permanent disability, it must appear by the proofs that continued or permanent disability is reasonably certain to result from the injury complained of." To the same effect are *Curtis v. Rochester & S. R. Co.*, 18 N. Y., 534; *Scheffer v. Washington City, V. M. & G. S. R. Co.*, 105 U. S., 249 ; *City of Chicago v. Langlass*, 52 Ill., 256; *Lincoln v. Saratoga & S. R. Co.*, 23 Wend. [N. Y.], 425; *Chicago, B. & Q. R. Co. v. Warner*, 108 Ill., 538; *Baltimore City P. R. Co. v. Kemp*, 61 Md., 74.

This is a very unusual case. Here was a man hurt in June, 1888, by being struck on the side by a board falling from a wagon or by one of its wheels passing over his body. No bones are broken; no injury is visible; he is, to quote his own testimony, up and around, driving his horses and hauling brick until July, 1889; at this time he has pleuritic trouble—typhoid. May 1st, his disease, whatever it is, and however caused, is incurable; he is dy-' ing, and the jury say as the result of his injury in 1888. Guided by the authorities quoted above, for this verdict to stand it must have for support competent evidence that establishes that Brady's present condition is probably and reasonably the result of the accident of June, 1888. That Brady was well before June, 1888; that he has never been well since, and is now dying, is not enough in this case to authorize the jury to infer that this accident caused his present disability. That physicians say his present condition is possibly the result of an injury received in June, 1888, is not competent evidence to support such a finding. If this verdict was much larger than it is, and if it had for support evidence showing that Brady's condition was probably and reasonably the result of the accident sustained, we would not, because of its amount, disturb it; but we are constrained to say that this verdict, in so far as it awards Brady damages for a permanent injury, is not supported by competent evidence. The judgment of the district court must, therefore, be reversed and the case remanded for a new trial, unless counsel for Brady shall, within twenty days, file with the clerk of this court a remittitur of $5,000 from the judgment rendered herein; and in case of their compliance with this order, the judgment of the district court for $2,000, with seven per cent interest thereon from May 3, 1890, and costs of suit, will be affirmed; and it is so ordered.

JUDGMENT ACCORDINGLY.

IRVINE, C.: I concur in the foregoing opinion throughout, except that I think the instructions submitting to the jury the questions as to escaping steam were, under the evidence, prejudicially erroneous, and that the judgment of reversal should therefore be absolute.