ELAM G. KNIGHT vs. GOODYEAR'S INDIA RUBBER GLOVE MANUFACTURING COMPANY.

Proprietors of factories are not entitled to use steam-whistles on their factories, so located, of such a character, and used in such a manner, as to frighten horses of ordinary gentleness when passing upon the highway adjoining their land; and they are responsible for an injury caused by an unnecessary, alarming, or frightening use of them. It is not negligence to drive a horse upon a highway, in the course of one's business, in good faith, where such a whistle may be unnecessarily blown. *Aliter* of whistles upon railroad engines.

TRESPASS ON THE CASE ; brought to the Superior Court in New Haven county, and tried on the general issue closed to the court. Facts found, and case reserved for advice. The facts were as follows :

The plaintiff is a practising physician. On the 24th of November, 1865, after visiting a patient in Naugatuck, he started in a chaise to return to his home in Waterbury. The horse driven by him was well broken, kind and gentle in every respect, except that he was easily frightened at unusual noises, especially steam whistles on locomotives and manufacturing establishments, which fault was well known to the plaintiff. The way taken by him led across the Nau-gatuck railroad near the station in Naugatuck, and also by the shop or factory of the defendants, situated about two hundred feet from the railroad, the front of the shop standing on the line of the street. The defendants' steam-whistle was above the roof of a one story building, and fifty-four and a half feet from the line of the street. The main buildings were higher than the whistle, and were so situated as to be between the whistle and people in the street, except at one point where there was an opening between the roofs, which opening was nearly in a line with and between the whistle and the point in the highway where the plaintiff was when the whistle blew. The plaintiff left the house of his patient a little before 12 o'clock, noon. He knew that it was nearly 12 o'clock, but supposed that he had ample time to get by the defendants' factory before the whistle should blow, but did not look at his watch. There was another way from that point to Waterbury, equally near and equally feasible, but the plaintiff

mistakenly supposed that there would be a freight train at a small station above, which induced him to take the way leading by the defendants' factory. As he was about to start, the regular passenger train left the Naugatuck station going north, passing by the house where the plaintiff then was, and in plain view of the horse, at a distance of about fifteen rods. That and other trains on that road usually blow the whistle when nearly opposite the place where the horse then stood, but it did not appear that it actually blew on that occasion. As the plaintiff started, his horse was nervous and excited, but was under the plaintiff's control until he reached the railroad crossing. The ground descended nearly all the way, in some places quite steep, and the horse acquired considerable speed, and crossed the railroad at a rapid gait. As the wheels struck the railroad track, the horse was startled, and jumped, and immediately thereafter the defendants' whistle blew for 12 o'clock. The horse at once became unmanageable. At that time two teams going in opposite directions had met, and were standing in the highway directly in front of the defendants' factory. It was more feasible to pass the teams on the side next the factory, and there was ample space for that purpose if the horse could have been controlled; but the plaintiff, being unable to control him, and seeing that a collision was inevitable, jumped from the chaise, and the chaise immediately collided with one of the teams, and struck the ground near the plaintiff. The plaintiff struck the ground in front of and near to the defendants' factory, the whistle continuing to blow until after the plaintiff struck. The defendants' whistle was called a double whistle. It consisted of two whistles, placed at right angles with each other, both of an usual and ordinary size and construction, and both fed from the same pipe. One produced a shrill, sharp, piercing sound, and the other a grum sound, but louder, and could be heard at a greater distance. Both were blown together, though not commencing at the same instant. They were on different keys, and the combined sound produced a discord; the discordant effect was greater near by than at a distance. Where the plaintiff was the sound was startling and terrific, and well calculated to frighten,

to some extent, horses of ordinary gentleness. Other horses had been frightened at the same place, but it did not appear that any before had ever become unmanageable; nor did it appear that the defendants had any knowledge that it had frightened horses, or that the whistle from its location or otherwise was dangerous. The two whistles had been used together only about twenty-one months; previous to that the smaller and sharper whistle had been used alone. The whistle was blown in the ordinary way, and there was no other intention or design on the part of the defendants, in the construction and operation of their whistle, than to produce a sound that could be distinguished from other whistles, and one that should answer the ordinary purpose of a steam whistle in such establishments. This whistle in itself was no more calculated to frighten horses than many others in use on other factories; nor as much so as locomotive whistles generally. But its location, in connection with the railroad crossing, the depot, the cars, and other objects usually being around railroad stations, caused it to be more dangerous than it would otherwise have been. There was no negligence either in the plaintiff or the defendants, except such as ought to be inferred from the facts found. The plaintiff was seriously injured and suffered great bodily pain, having been confined to his bed ten weeks and over, and almost entirely incapacitated for business for more than seven months, and is partially disabled for life.

*C. R. Ingersoll* and *Gillette*, for the plaintiff, cited *Bishop* v. *Banks*, 33 Conn., 121; *Whitney* v. *Bartholomew*, 21 id., 213; *Dimock* v. *Town of Suffield*, 30 id., 129; *Daley* v. *Norwich & Worcester R. R. Co.*, 26 id., 597; *Fox* v. *Town of Glastonbury*, 29 id., 208; *House* v. *Metcalf*, 27 id., 631; *New Haven Steamboat & Transportation Co.* v. *Vanderbilt*, 16 id., 427; *Beers* v. *Housatonic R. R. Co.*, 19 id., 570; *Cole* v. *Fisher*, 11 Mass., 137; *Hill* v. *Portland & Rochester R. R. Co.*, 55 Maine, 438; *Conklin* v. *Thompson*, 29 Barb., 220; *Cook* v. *Champlain Transportation Co.*, 1 Denio, 98; Shearm. & Redf. on Negligence, §§ 587, 588; *Soltau* v. *DeHeld*, 9 Eng. L. & E., 104; *St. Louis, Alton & Terre Haute R. R. Co.* v. *Todd*, 36 Ill., 409.

*Kellogg* and *Webster*, for the defendants, cited *Whitney* v. *Bartholomew*, 21 Conn., 217 ; *Dimock* v. *Town of Suffield*, 30 id., 132, 134 ; *Fox* v. *Town of Glastonbury*, 29 id., 204 ; *Park* v. *O'Brien*, 23 id., 339 ; *Brown* v. *Kendall*, 6 Cush., 292 ; *Rockwood* v. *Wilson*, 11 id., 221, 226 ; *Parker* v. *Adams*, 12 Met., 416 ; *Murphy* v. *Dean*, 101 Mass., 455 ; *Bancroft* v. *Boston & Worcester R. R. Corporation*, 97 id., 275.

BUTLER, C. J. The gravamen of this action is, that the defendants erected and used upon their own land a steam-whistle of such a character as to frighten horses of ordinary gentleness when passing upon the highway adjoining their land, and that the whistle was blown with such violence when the plaintiff was passing upon the highway, as to frighten his horse and occasion the injury complained of.

The case does not involve the question whether the defendants were entitled to use a steam-whistle instead of a bell on their factory, but whether they were entitled to use such a whistle, within fifty-four and one-half feet of the highway, to make such a dangerous noise as the finding shows was made in this case. I think they were not.

I. It is sufficiently found that the plaintiff's horse was well broken, kind and gentle in every respect, except that he was easily frightened at unusual noises, especially at steam-whistles. No contributory negligence can be attributed to the plaintiff for driving such a horse upon the highway. Horses and other animals are always frightened by such whistles until they become accustomed to them, and it is not negligence to drive a horse upon a highway, in the course of one's business, in good faith, where such a whistle may be unnecessarily blown. Such whistles are necessary upon railroad engines, to frighten horses and cattle that may stray upon the road in front of the engine, and drive them from the track. They are also necessary to give notice of the approach of a train to persons about to cross the track at such a distance that the bell cannot be heard. In these and other cases, their use upon railroads is important and valuable, and both sanctioned and required by law, and in such cases the usefulness of the

whistle depends upon the alarming and frightening character of the noise it makes, and one of the purposes for which it is used is to frighten and alarm.   This is well understood, and the owners of animals which have not become accustomed to whistles are bound to submit to the necessities of the case, and if they drive them where *locomotive* whistles are liable to be blown, they take the risk upon themselves, and if any injury results they can have no redress.   But the rule should be and is different in respect to whistles used upon factories. Their use is not necessary at all, but if used there is no necessity for constructing them in such a way, and using them in such a manner, as to alarm or frighten any person or animal. All the purposes to be attained by their use upon factories can be attained without constructing and using them in an alarming manner.   It follows that an unnecessary, alarming, or frightening use of them, if productive of injury to another, is wrongful, and the proprietors should be holden responsible for the injury.

II.   It appears from the finding that the whistle in this case was a compound or double whistle, combining a shrill, sharp and piercing sound, with one that was grum and loud ; that the combined sound was *discordant, startling* and *terrific,* and well calculated to frighten to some extent horses of ordinary gentleness, and had in fact frightened them before at the same place ; that at the time in question the whistle was so blown ; and the clear import of the finding is, that although the plaintiff's horse had been excited by a previous blast from a passing railroad whistle, he was under the plaintiff's control, and only became unmanageable when this " terrific" blast was blown from the defendant's whistle *nearly over his head.* The injury was the direct result of that blast.

III.   There is no principle known to the law which will justify the defendants in the use of such a whistle in such a place.   Their right to use a whistle must be conceded, but like all other rights it must be so exercised as not to endanger and injure others.   It is no answer to say that they did not erect or blow the whistle for any such purpose, or that they had no knowledge that it frightened horses, or that they did

not suppose it was calculated to frighten them. These facts, if they existed, they were bound to know or anticipate. When a man exercises a particular right in a particular manner calculated to produce injury to another, he must be held to a knowledge of the possible or probable consequences of his act, and cannot be excused because he did not intend or expect those consequences. It is an elementary rule that every man must be presumed to intend the natural and necessary consequences of his acts, and there is nothing found in this case which will exempt the defendants from the operation of that rule.

The Superior Court must be advised to render judgment for the plaintiff.

In this opinion the other judges concurred; except PARK, J., who dissented, and SEYMOUR, J., who did not sit.