## ST. LOUIS EXPANDED METAL FIREPROOFING COMPANY V. FRANK B. DAWSON.

### Decided October 29, 1902.

**1.—Negligence—Subcontractor—Employe of Contractor—Injury.**

Where a contractor employs a subcontractor to put cement floors in a building, and the latter delivered over a floor as complete, it could not claim that the contractor's employes, in afterwards going on the floor in the transaction of their business, were trespassers, so as to be precluded from recovering for injuries due to its negligent construction of the floor; and in afterwards making changes and repairs in the floor, the subcontractor was charged with the duty to the contractor's employes of using due care.

**2.—Same—Foreseeing Injury.**

A subcontractor engaged in putting in cement floors in a building, who, after replacing a cracked panel, removed the support, without giving it sufficient time to harden and become safe, should have foreseen that parties going on it would receive injury, and knowing that employes of the contractor were at work in other parts of the building, and that their work in that part was not complete, he should have foreseen that they might go on the panel.

**3.—Same—Knowledge of Contractor—Injury to Employe.**

Although a contractor who had employed a subcontractor to put cement floors in a building knew that the latter had replaced a defective panel in the floor, this would not preclude one of the former's employes, who had been injured by a breaking through of the panel under his weight, from recovering for the injury, where neither the contractor nor the injured employe knew of the fact which caused the injury, viz., the removal of the support from under the panel before it had time to harden.

**4.—Same—Assumed Risk.**

The danger to the employe from going upon the defective panel was not, under the facts, a risk which he had assumed.

**5.—Same—Fact Case.**

Evidence held not to show that an employe knew that a particular panel in a cement floor had just been taken out and replaced and the support under it removed, so that it was unsafe to walk on it.

Error from the District Court of Bexar County. Tried below before Hon. J. L. Camp.

*P. H. Swearingen,* for plaintiff in error.

*James Routledge* and *J. R. Norton,* for defendant in error.

JAMES, CHIEF JUSTICE.—This cause was once remanded for a new trial as between appellee and appellant. 59 S. W. Rep., 847, 61 S.

W. Rep., 118. Additional testimony was adduced on the last trial which materially affects the disposition of the case in this court. As conclusions of fact in support of the verdict we find from the evidence, following in their order the propositions relied on in appellant's brief, the following facts: (1) That Dawson was rightfully upon the floor where and when he was hurt, in the prosecution of his work. (2) The injury he received was due to the negligence of appellant in leaving the reconstructed panel in an unsafe condition for workmen engaged thereon, and the presence of Dawson upon the panel and his injury were within what could have reasonably been anticipated, and that appellant owed him the duty of proper care in respect to the safety of the panel. (3) The dangerous condition of the panel was unknown to Dawson or to his master Shields, and plaintiff did not assume the risk.

These general conclusions of fact are given in view of the statute requiring conclusions of fact, and in the course of this opinion the evidence will be referred to more in detail.

The assignments of error are grouped in an unusual and complex manner, but propositions under them are distinctly presented, and to these our attention will be directed and confined. These propositions contend chiefly for the questions arising on the evidence and involved in the finding of the jury.

It appears that Dawson was a carpenter in the employ of Shields, who had the contract for building the addition to the Southwestern Insane Asylum. Appellant was his subcontractor for the construction of the cement floors. The misfortune occurred on the second floor of the north wing. That floor had been completed so far as the work of appellant thereon was concerned, and some weeks before the accident had been turned over to Shields as complete for him to prosecute his work thereon. Shields had gone there with his men and materials, had carried up the walls of another story, and the next floor above had been constructed. In constructing the flooring the concrete was laid between iron joists and was supported by scaffolding or centering below, until it had become sufficiently hardened and set. The supports had been removed and the floor appears to have been safe when delivered over to Shields, and he had used it to work thereon in carrying up the walls and in erecting the supports for the next floor, which had also been put in at the time of this accident. It was a part of Shields' work, under his contract with appellant to construct the scaffolding or centering in the first instance, but any extra work was to be done by appellant. It was an understanding between Shields and appellant's foreman, Jester, when they started work, that Shields would give him the portion of the building he was working on until he (Jester) told him it was ready to go on to work. Under the floor in question on Thursday before the accident (which occurred on Saturday) a slight crack was observed in one of the panels, and according to the testimony of Jester, appellant's foreman, Shields told him to replace that panel and he told

Shields that he would. Shields testified that he called Jester's attention to this crack, and said: "You see this crack here?" Jester said: "Yes, I have noticed that." Shields said: "You will have the same to do you had down below, and when Gordon (the architect) comes he will make you take it out. Now you know what is best to do about it. If Mr. Gordon comes and finds it out he will certainly make you take it out, and you might as well do it without having him come after you," and he said, "I will do that when I get time." Under the contracts the architect (Gordon) was the person to order such repairs to be made, and not Shields. This conversation took place on Thursday, and the next day Jester had the particular panel removed and replaced, putting up centering under it to sustain it. The next day (Saturday) Jester took away the centering to use the lumber for some other purpose, leaving the freshly repaired panel without support, and after this was done, Berry, Shields' foreman, or Shields, at the request of the superintendent of the asylum, sent Dawson and another employe, Fuos, to that floor to board up an open doorway that had been left between this room and the main building to keep the wind out of the main building where the inmates of the institution were. The repaired panel was right at this door, and in doing this work the panel gave way under the men and plaintiff fell into the lower story and was injured. The injury happened very soon and much less than an hour after Jester had removed the centering below the panel. There was abundant testimony showing that the centering had not been allowed to remain under the new panel the required or the usual time nor long enough to allow the panel to become hardened and safe for use. It was shown by evidence that at the time of this accident and during that week Shields had his carpenters working on another wing of the building, but there was testimony that during the week a few days before the accident they had been working on this floor putting strips on the floor to nail the wood floor to, and had nailed down the strips except at the west end of the room where the panel was situated, leaving that part of the work unfinished. At the time Jester repaired the panel Shields with his men were engaged on the other wing. Fuos testified that lots of times while they worked on the south wing Berry would move the workmen to other parts of the building. It appears that neither Shields, Berry, nor Dawson knew that Jester had undertaken to repair the panel.

The first proposition of plaintiff in error is: "Dawson had no right on the panel through which he fell on the Saturday of the accident."

The second proposition is that the evidence "shows that there was no duty which the metal company owed either to Dawson or to the public in a matter whereof Dawson had the right to avail himself."

We can not sustain these contentions. The floor having been completed and delivered to Shields for the purposes of the further construction of the building, neither Shields nor his employes could be classed as trespassers in going upon that floor to perform any work

necessary or expedient to be performed there. And to employes so engaged appellant owed the duty of due care in respect to changes or repairs it might make in respect to such floor affecting its safe condition.

The third proposition is: "The injury to Dawson was not the proximate result of replacing the panel complained of, because the metal company could not have reasonably anticipated that the panel would be used by Dawson at the time and in the manner it was, before it had become sufficiently hardened to sustain his weight."

According to testimony before the jury, the panel being newly placed and the support taken from under it rendered it an unsafe place for persons to go upon, and was practically a trap, and it could certainly have been foreseen that persons going upon it might receive injury. The only further question, it seems to us, is, could it have been reasonably foreseen or expected, under the circumstances, that Shields' men might be put to work there before the necessary time had elapsed for this panel to have become sufficiently firm? Beyond the mere fact that Shields had his men working in another portion of the building, there was no foundation for the theory that none of them would be sent to this floor for any purpose during such period.

There is nothing in the evidence beyond that fact to justify appellant in assuming that Shields' men would not return to perform some work in that room. The room was unfinished in many respects. The strips had not all been laid; and the door in question, which led through the wall into the main building, was open and exposed the inmates of the institution to the weather, which was inclement at the time. It depended entirely on the will of Mr. Shields or his foreman Berry to send workmen to that room. Shields testified he could have done this at any time. They had not said to appellant that they would keep their men away from there, or keep them in the other wing. That the work done on this door was done at the request of the asylum superintendent does not make the case any different than if Shields or Berry had foreseen the necessity of it and forestalled the request. The understanding between Shields and Jester to the effect that Jester was to have the part of the building he worked upon until such time as he informed shields that he could use it, evidently had no application after he had once done this, unless perhaps Shields knew of the subsequent repairs being carried on, which, as will be shown in another part of this opinion, he did not. It is a significant circumstance in connection with the propositions under consideration that Jester, when he removed the centering from under this panel, went upon the panel and tested it, which is hardly consistent with the idea that he had no reason to suspect that Shields and his men would not go upon it for some purpose incidental to his work, before the necessary time elapsed for it to become firm enough for their use. Under the facts and circumstances we think the jury were warranted in finding that by the exercise of ordinary care appellant could have reasonably foreseen that the em-

ployes of Shields would go upon the panel while it was yet dangerous to do so, and this issue was fully submitted. What is here said practically disposes of the ninth and tenth assignments also.

The fourth proposition is: "Dawson went upon that floor before it was sufficient to sustain him, in obedience to the order from his master. The knowledge of the master must be imputed to the servant so far as this company is concerned. The danger was known to the master, hence the servant can not recover of this company."

It would seem that there is some conflict in the testimony of Shields and Jester as to the conversation about repairing the panel. According to Jester's version Shields directed him to repair it, and Jester told him he would do it. From this it might have been found that Shields should have expected and known that Jester would undertake the repair at any moment. The following charge was requested by appellant and refused: "If you believe from the evidence that Shields knew, or by the use of ordinary care could have known, that the panel was freshly laid and insufficient to sustain the weight of plaintiff and Fuos, and that Shields, the employer of plaintiff, in person or through his foreman ordered plaintiff to go on that particular panel on the day of the accident, then you will return a verdict for the defendant." We think we need not go into the question of whether or not the negligence of Shields would be imputed to his employe. The testimony in our opinion was not such as would warrant the inference that Shields was charged with notice of the dangerous condition of the panel. That he and Berry, his foreman, and Dawson had no actual notice of it is certain. No one had been notified of the repair. No one but Jester and his foreman appears to have actually known of it. No other person was shown to have been in a position to see or know it. And it was not the repairing of the panel that constituted the danger. As long as the centering remained under the panel it was safe. It was rendered dangerous by the premature removal of the centering, which was done less than one hour before plaintiff went there. Shields, if he had reasan to know or expect that the panel would be repaired at once, had no reason to know or suspect that the necessary centering, which all the evidence shows was required to remain in position for a number of days, would be removed as it was. There is, in our opinion, absolutely nothing in the evidence that would have warranted the court in submitting to the jury either knowledge or constructive knowledge on the part of Shields of the danger existing by reason of the removal of the centering.

The next proposition is that "Dawson assumed the risk of walking on the second floor then in course of construction." All the evidence shows that Dawson was ignorant of the danger, and it can not be said that the danger was one which he must necessarily have become acquainted with in the prosecution of his work.

The next proposition is: "Dawson knew the panel had been put in on Friday of the week of the accident and saw Jester take out the cen-

tering." There is absolutely no evidence of this. It seems to be considered by appellant that it devolved on plaintiff to show by his testimony that he did not know that the panel had been freshly laid and the centering taken out. We need not stop to consider on whom the burden of proof rested on this question. The evidence was sufficient to show that plaintiff was ignorant of these facts. Plaintiff may not have testified in terms that he did not know them. But what was shown was this: Plaintiff testified that he couldn't tell any difference between the panel that fell and the surrounding panels. The danger had just been created by the removal of the supports. No one was shown to have known of the danger but Jester, who removed them. No one outside of him was shown to have been at or near the place in order to have obtained knowledge of the fact. Jester informed no one. None of Shields' men had been about these premises up to the time plaintiff and Fuos were sent to this floor. Certainly under this testimony it was possible for the jury to find that plaintiff was ignorant of the danger.

By the eighth assignment of error it is contended that the court erred in charging the jury that "if defendant was guilty of negligence in respect to said panel, and such negligence was the proximate cause of plaintiff's injury, to find for plaintiff, in that the undisputed testimony shows that plaintiff was not permitted on the panel for at least 72 to 120 hours (three to five days) after it was laid, whereas he went upon it within 36 to 48 hours after it was laid. And no matter whether the material was defective or not, defendant at least had the right to the full time for the hardening of the panel." This contention might possibly have had some applicability to the floor as originally laid and before it had been turned over to Shields. The testimony above quoted evidently has reference to the floors before completion and before delivery of same to Shields as complete.

The testimony concerning plaintiff's suffering and injury is such that we can not pronounce the verdict excessive.

                                                                    *Affirmed.*

. Writ of error refused.