SCOTT et al. v. SHINE. (No. 8500.)

(Court of Civil Appeals of Texas. Ft. Worth. Feb. 10, 1917. On Motion for Rehearing, March 31, 1917.)

1. MUNICIPAL CORPORATIONS �824706(5) — STREETS—FRIGHTENING HORSE—EVIDENCE—SUFFICIENCY.

Evidence *held* to sustain finding that a cotton gin was not constructed and operated, as to escape of steam from the exhaust pipe, as a person of ordinary prudence would have constructed it, so as to render the owner liable for injuries when a horse became frightened by the exhaust.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1518.]

2. MUNICIPAL CORPORATIONS �824706(5) — STREETS—FRIGHTENING HORSE—EVIDENCE—SUFFICIENCY.

Evidence *held* to sustain finding that a person of ordinary prudence would have anticipated that the exhaust from a gin would have frightened a horse under the circumstances under which plaintiff's horse was frightened and she was injured.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1518.]

3. MUNICIPAL CORPORATIONS �824706(5) — STREETS—FRIGHTENING HORSE—EVIDENCE—SUFFICIENCY.

Evidence *held* to sustain finding that escape of steam from cotton gin exhaust pipe was reasonably calculated to frighten horses of ordinary gentleness and cause them. to run away when driven along the street.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1518.]

4. MUNICIPAL CORPORATIONS �824706(8) — STREETS — FRIGHTENING HORSE — INSTRUCTION—"MIGHT."

In action for injuries when horse was frightened by steam exhaust, instruction on anticipation of accident that the method of construction and operation of a cotton gin "might" probably cause horses of ordinary gentleness to be frightened did not import mere possibility and was correct.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1518.

For other definitions, see Words and Phrases, First and Second Series, Might.]

5. TRIAL �824350(6)—ISSUES—TRADE CUSTOM.

Trade custom in constructing cotton gins being admissible on issue of negligence, but not conclusive, it is not error to refuse submission of special issue whether defendant complied with such custom, where there was evidence that the gin could easily have been so constructed as to avoid the danger.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 830.]

6. DAMAGES �824221—MEASURE OF DAMAGES—AGGREGATE FINDING.

In the absence of request for separate findings of special damages pleaded, a requirement that the jury find the damages in the aggregate is not erroneous.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 563–566.]

On Motion for Rehearing.

7. APPEAL AND ERROR ⬅1170(9)—REVERSAL —NATURE OF ERROR.

In view of rule 62a (149 S. W. x) error, if any, in disregarding a bill of exceptions to instructions requiring an aggregate finding of damages where the petition pleaded separate special damages was harmless, unless it was reasonably calculated to, and probably did, cause an improper judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4066, 4543.]

Appeal from District Court, Tarrant County; J. W. Swayne, Judge.

Action by Mrs. H. T. Shine against Mrs. Elizabeth Scott and another, as executors of the will of Winfield Scott, deceased. Judgment for plaintiff, and defendants appeal. Affirmed.

I. W. Stephens, Miller & Miller, and Glover C. Johnson, all of Ft. Worth, and Thompson, Knight, Baker & Harris, of Dallas, for appellants. Robert Harrison, of Ft. Worth, Morrow & Morrow, of Hillsboro, and Charles L. Black, of Austin, for appellee.

DUNKLIN, J. Winfield Scott owned a cotton gin situated in the town of Itasca near the intersection of two public streets, one running east and west, and the other running north and south, the location of the gin being south of the street running east and west and east of the street running north and south. On September 17, 1910, Mrs. H. T. Shine was riding on the rear seat of a surrey drawn by a filly 2½ or 3 years old, which was driven by Miss Jessie Barnes, a young lady about 19 years of age, who sat on the front seat of the surrey with another young lady, Miss Kathleen Elmore, of about the same age. The surrey approached the intersection of the two streets from the north, and upon reaching such intersection turned east upon the street running east and west. About the time or immediately after said turn was made, the filly became frightened, wheeled, and ran west with the vehicle, throwing Mrs. Shine to the ground and injuring her. Mrs. Shine instituted this suit against Mrs. Elizabeth Scott and A. B. Robertson, independent executors of the last will and testament of Winfield Scott, deceased, to recover damages for the injuries so sustained by her, and from a judgment in her favor for the sum of $8,500, the defendants have prosecuted this appeal.

A pipe came out of the north wall of the gin house 16 feet above the ground, and extended horizontally and north to a distance of 18 inches from the north wall. This pipe was known as an exhaust pipe, through which steam from the boiler escaped into the air after being used for compressing cotton, and in her petition the plaintiff alleged that on the occasion of the accident, and just as the surrey reached a point in said east and west street about opposite the gin, steam escaping from the exhaust pipe was emitted in-to and across the street with a loud and roaring noise, and that by reason of said emission of steam with its accompanying noise, the horse became frightened and ran away. It was further alleged that the horse was a "gentle family horse."

After alleging the facts above mentioned and detailing the injuries sustained by the plaintiff, the petition contains the following:

"Plaintiff says that her said injuries are the proximate result of the negligence of the said Scott, his agents and servants; that they were negligent in maintaining said escape pipe so as to project out into the public street, and thus to emit steam and vapor into said street in a manner calculated to frighten horses and animals drawing vehicles along said street; that they were negligent in causing said steam and vapor to escape in such a manner as to cause unnecessary noise, and in such manner as to frighten the horse driven by the plaintiff; that they were negligent in not maintaining said escape pipe at some other and different place, so that the steam emitted therefrom would not go across said street, and so that said noise caused by the escape of said steam would not frighten horses and other animals passing along said street.".

In their answer the defendants alleged specially that the gin was a lawful structure erected for the convenience of those desiring to have their cotton ginned; that the owner had a lawful right to maintain it at the place and in the manner it was erected and maintained; that the gin was first class and of modern construction, and equipped with the necessary appliances to do the work for which it had been built; that it was necessary in the operation of the gin to equip it with an exhaust pipe for the escape of steam into the air as quickly as possible; that the exhaust pipe was as short as a due regard for the safety of the plant would permit; that said exhaust pipe did not extend into or across any public street, as alleged by the plaintiff, but only a short distance beyond the walls of the gin, and that the escape of steam and vapor from the pipe situated as was the gin was not reasonably calculated to frighten horses of ordinarily gentle disposition; and that the owner of the gin could not reasonably have anticipated that any such result as plaintiff alleges would occur, and if any such injury did result to plaintiff as alleged, the same was not the proximate result of any negligence on the part of the owner of the gin. Defendants further alleged that if the horse became frightened, such fright was caused by the usual and ordinary operation of the gin without fault of the owner or its employés, and said gin was operated with reasonable care and in the manner in which cotton gins are usually operated, all of which facts were well known to the plaintiff at the time.

By supplemental petition plaintiff controverted the facts set out in the defendant's answer, and in connection therewith pleaded further as follows:

"Plaintiff further says in this connection that, not only was it negligence to maintain and use

said gin at the place and in the manner that such was being done, but that said gin as so maintained and used was in law a nuisance, threatening injury to those lawfully traveling the adjacent highway in vehicles drawn by horses."

The case was submitted to the jury on special issues, which, together with the findings thereon, are as follows:

"(1) Was the Scott gin at Itasca at the time plaintiff is alleged to have been injured constructed and operated as to the escape of steam from the exhaust pipe in such a manner as a person of ordinary prudence would have operated it? Answer: No.

"(2) In constructing and operating the Scott gin at Itasca at and before the time plaintiff was injured, would a person of ordinary prudence have reasonably anticipated that the escape of steam from the press of said gin might probably cause horses of ordinary gentleness to take fright and run away when driven at the place where the horse in question was being driven when it became frightened and ran away? Answer: Yes.

"(3) State whether or not the escape of steam from the exhaust pipe in pressing cotton at the Scott gin in Itasca at the time plaintiff is alleged to have been injured was reasonably calculated to frighten horses of ordinary gentleness and cause them to run away when driven along the street where the horse in question was being driven when it took fright and ran away. Answer: Yes.

"(4) What amount of damages, if any, do you find that the plaintiff has sustained? In determining the amount of damages you may take into consideration the following matters only: Such doctors bills, if any, of reasonable amount, as she has paid on account of such injuries; the reasonable value of such time, if any, as she has lost in the past as a result of such injuries, and of such time, if any, as she will probably lose in the future as a result of such injuries; the physical pain, if any, and mental anguish, if any, that plaintiff has heretofore suffered as a result of her injuries, and the physical pain, if any, and the mental anguish, if any, that plaintiff will probably suffer in the future as a result of such injuries. On the special issues submitted to you herein you are instructed that the burden of proof is on plaintiff to prove by a preponderance of the evidence her contention with reference to said issues. You are the exclusive judges of the credibility of the witnesses, of the facts proven and of the weight of the evidence but you will receive the law from the court as given herein. Answer: Eight thousand and five hundred dollars ($8,500.00)."

The evidence conclusively established the following facts: The gin was erected on property owned by Winfield Scott; the north wall was as near as about 23 feet south of the street running east and west, and the west wall about 61 feet east from the street running north and south. The exhaust pipe was 1 inch in diameter, and through it was discharged steam from a cylinder 6 feet by 12 inches in diameter. This pipe came out of the north wall of the gin, and at a distance of 18 inches from that wall extended 16 feet above the ground. It did not extend out into or across the street, as alleged by the plaintiff, but it was so pointed that the steam therefrom was emitted in the direction of the street running east and west. The noise and appearance of steam emitted from the pipe was the usual and customary noise and ap-

pearance of steam made in the operation of gins. The width of the street last mentioned was 50 feet, and at the time the filly became frightened she was north of the middle line of said street, or at a distance of at least 50 feet, and probably several feet farther, from the exhaust pipe. The sound created by the exhaust of steam from the pipe was similar to that of an explosion, followed by a hissing noise. When the horse on the occasion in question started east from the street running north and south, the steam from the exhaust pipe came out suddenly, and in a manner, which is described by Miss Elmore, one of the young ladies in the surrey, and not controverted by any other testimony, as follows:

"It came out suddenly and made a loud noise. It was first like an explosion. followed by a little increase in volume, then dies away with a hissing noise. When the steam first came out the horse jumped, then as it increased the horse wheeled suddenly to the right, turned entirely around, and ran a little northwest."

As a result the buggy was overturned and the occupants dragged thereunder for a short distance, and in that way Mrs. Shine was injured. When the horse first took fright, and before she wheeled in the opposite direction, the driver tapped her with the lines.

The evidence further shows without controversy that the gin was of modern pattern, and that its construction was in accordance with the most approved plans of construction, save and except that the testimony showed without conflict that the exhaust pipe could have been so turned and directed as to cause the waste steam to be discharged into an excavation in the ground, or on the opposite side of the building, rather than in the air 16 feet above the ground, and that by this method the noise of the exhaust to persons passing on the street running east and west would have been diminished, and that the steam would not have been projected in the direction of the street. There was also testimony that at least one gin in that vicinity so constructed its exhaust pipe as to cause it to discharge the waste steam into an excavation in the ground. Vernon Millsap, a witness for the plaintiff, and the owner of the animal, testified without contradiction that the accident happened during the second season the gin was operated, and that during that time, and on probably as many as 50 occasions, he had driven the animal by this gin on the road running east and west while the gin was in operation and discharging steam from the exhaust pipe, and that the animal had never on any of those occasions taken fright at such exhaust of steam, although this witness did not testify as to whether or not the exhaust steam reached the street on any of those occasions. The ginning season usually began in August, and the accident happened September 17, 1910. No testimony was offered to show that any other horse had ever at any time been frightened by said exhaust

of steam, although the street running east and west was a public street in the town of Itasca and in common use by the public. Several witnesses, who were qualified by experience in handling horses and who were familiar with the noise and appearance of steam emanating from the exhaust pipe in question, testified that in their opinion the same would not frighten horses of ordinarily gentle dispositions, and no witness testified to a contrary opinion.

But Miss Jessie Barnes, who was driving the animal at the time, testified as follows:

"The horse was the property of my stepfather, Vernon Millsap, and was reliable and gentle and easy to handle. * * * There was a pipe extending just a short distance from the building up near the top of that part of the building near the street, with the open end of the pipe pointed towards the street, as I remember it. I do not know what this pipe was used for, but I do know that steam came from the same, in the form of an exhaust, at the time of the accident above mentioned. There was a large volume of steam emitted into the street, accompanied with a noise in the form of an explosion, increasing in noise for some time and then dying away. It was a loud noise. The steam settled in the street just in front of the horse we were driving. The steam and noise together caused the animal we were driving to turn suddenly around, turning the surrey over. It frightened the horse badly."

W. B. Smith testified that he witnessed the accident from a point just north of the street running east and west at a distance of about 60 feet, or maybe a little further, from the ginhouse. He testified that:

Just as the surrey turned east upon the east and west street, "the press ran down, and the vapor or steam was pressed out, and, as that happened, the mare wheeled to run, and just as she wheeled to run, it escaped back, going up, and she seemed to get frightened worse than ever and ran. * * * There were two explosions at the time, one as the press went down and one as it came back. There is some noise connected with these explosions, and it is pretty loud."

Vernon Millsap, the stepfather of Miss Jessie Barnes, testified that he had owned the animal for nearly a year prior to the accident, and that she had never shown any disposition to run away or to scare at objects. He further testified that he had observed the Scott gin in operation ever since its erection, and that the exhaust made a very loud report, which could be heard 200 or 300 yards away.

Plaintiff's brother, G. H. Abernathy, testified that he was familiar with the location of the exhaust pipe in the Scott gin, and had had occasion to observe the escape of steam from other such exhaust pipes and the distance it would travel after leaving such a pipe and before its force was expended in the air, but had never seen the Scott gin in operation, and according to the opinion testified to by him, if the wind was favorable, it was possible for steam from the exhaust pipe in the Scott gin to be exhausted with sufficient force to be thrown across the street running east and west.

But, according to the testimony of several other witnesses, the steam from the exhaust pipe could not reach the south boundary of said street, but its force would be expended at a distance from 12 to 15 feet from the end of the pipe. The weather was clear on the day of the accident, and the record is silent as to whether or not the wind was blowing, except that one witness testified that the "wind blew from the south pretty well all the time," nor as to the condition of the atmosphere with respect to its humidity, further than as might possibly be inferred from the fact that the weather was clear.

By appropriate assignments appellants insist that the evidence was insufficient to support any of the findings of the jury in answer to issues Nos. 1, 2, and 3; the contention being made that the evidence conclusively showed that the gin was constructed according to the most approved plans, upon property owned by Winfield Scott, carefully operated and in the usual manner such gins were operated; that the distance of the exhaust pipe from the street was as recited above, and that the noise and appearance of steam therefrom were the usual, customary and necessary incidents to the operation of such gins, and not reasonably calculated to frighten horses of ordinary gentleness; and that a person of ordinary prudence would not reasonably have anticipated the fright and runaway of the animal in question under such circumstances.

The same contentions are made the predicate of another assignment of error to the refusal of the defendants' request for an instructed verdict in their favor.

Appellants have cited many decisions in suits against railway companies for damages resulting from accidents caused by teams, while driven on a public highway, becoming frightened at the sound of whistles, or the escape of steam from their locomotives while in operation, in all of which it was held that no liability was shown. Some of those cases are O'Dair v. M., K. & T. Ry. Co., 14 Tex. Civ. App. 539, 38 S. W. 242; C., R. I. & T. Ry. Co. v. Jones, 39 Tex. Civ. App. 480, 88 S. W. 445; Hargis v. St. L., A. & T. Ry. Co., 75 Tex. 19, 12 S. W. 953; Omaha & R. V. Ry. Co. v. Brady, 39 Neb. 27, 57 N. W. 770; Lamb v. Old Colony Ry. Co., 140 Mass. 79, 2 N. E. 932, 54 Am. Rep. 449; G., C. & S. F. Ry. Co. v. Hord, 39 Tex. Civ. App. 319, 87 S. W. 848; Tex. Cen. R. R. Co. v. Harbison, 88 S. W. 414; G., H. & S. A. Ry. Co. v. Graham, 46 Tex. Civ. App. 98, 101 S. W. 846; 33 Cyc. 936, 937, 939. See, also, 1 R. C. L. bottom page 1207.

Without attempting to review those decisions at length, we think it sufficient to say that the rule announced therein, practically without exception, is that a railway company cannot be held liable for fright of teams from the sounding of locomotive whistles or the escape of steam therefrom, when the same are the usual and necessary inci-

dents to the operation of trains, unless the employés of the company in charge of the locomotive discover the danger of frightening an animal in time to avoid an accident by refraining from giving such causes of alarm, and thereafter negligently failed to desist, and such failure is the proximate cause of the accident. A railway company is also liable for damages resulting from the fright of a team caused by the blast of a whistle or the emission of steam, whenever such blast or emission of steam is unnecessary for the proper operation of the locomotive, and persons of ordinary prudence similarly situated would avoid such causes of fright.

The theory upon which a railway company is not liable for injuries proximately caused by an emission of steam and blast of whistles from its locomotives, whenever the same are necessary for the operation of its road and are not in excess of such necessity and are not produced after peril of the traveler on a highway is discovered, is that such acts are made lawful by the statutes. That idea is expressed in St. L., S. F. & T. Ry. Co. v. Shaw, 99 Tex. 559, 92 S. W. 30, 6 L. R. A. (N. S.) 245, 122 Am. St. Rep. 663, which was a suit for damages for the depreciation in the value of property and also for noise and discomfort to plaintiff occasioned by the operation of the railway company's business and the invasion of plaintiff's home by noise, dust, odors, etc., resulting therefrom; and in that case the Supreme Court, in denying the plaintiff the right to recover for personal annoyance suffered, and after referring to the fact that the plaintiff had suffered annoyance and discomfort in her home, but that there was no evidence to show that in the operation of the trains more noise, dust, cinders, and odors were produced than would necessarily attend such operations properly conducted, nor that the number of trains, engines, and cars were greater than was necessary to properly perform the duties to the public, used the following language:

"Here the defendant, in the location of its right of way, its main track, its freight depot and such sidings and spurs as were necessary to the proper carrying on of its freight business and the discharge of its duties therein, did only that which the law authorized it to do. In other words, for the public good, its action in these regards, so long at least as it was only a reasonable exercise of the privileges granted, was made lawful; and any incidental damage resulting to members of the public, beyond that caused to their property, against which they are protected by the Constitution, is to be regarded as damnum absque injuria, which must be borne because the work which inflicts it is authorized by law for the general welfare."

In the opinion rendered that decision was distinguished from such cases as Rainey v. R. R., T. & S. Ry. Co., 89 S. W. 768, 3 L. R. A. (N. S.) 590; Daniel v. F. W. & R. G. Ry. Co., 96 Tex. 327, 72 S. W. 578, which were decided upon the theory that as the acts of those companies complained of were not necessary to the enjoyment of the exercise of their charter powers, they might constitute nuisances which could be enjoined. To the same effect are Hargis v. St. L., A. & T. Ry., 75 Tex. 19, 12 S. W. 953, and Northern Transportation Co. v. City of Chicago, 99 U. S. 635, 25 L. Ed. 336.

Appellants also cite the case of District of Columbia v. Moulton, 182 U. S. 576, 21 Sup. Ct. 840, 45 L. Ed. 1237, which was a suit for damages for injuries resulting from the fright of an animal caused by a steam roller left by the agents of the District of Columbia by the side of a public highway. The steam roller had been in use in repairing the highway, but had become disabled and had been left near the highway temporarily. The negligence alleged by the plaintiff consisted in keeping the steam roller on the street for a period of two days so as to be a public nuisance and dangerous to travelers passing along said street with their carriages and horses. The Supreme Court in holding that the evidence was insufficient to warrant a recovery said:

"The steam roller in question had been brought to the place where the accident occurred for a lawful purpose, viz., that of performing a duty enjoined upon the District to keep in repair the streets subject to its control. The use of an appliance such as a steam roller was a necessary means to a lawful end, a means essential to the performance of a duty imposed by law. It must therefore follow that if in the legitimate and proper use of such machine, with reasonable notice to the public of such use, an injury is occasioned to one of the public, such injury is damnum absque injuria."

The court further held that the evidence showed that there was a necessity for a further use of the roller upon the street, and that the right to use the machine also included the right to keep it at the place where it was left for repairs for a reasonable length of time, and that the evidence conclusively showed that the time during which it was kept there was not unreasonable. So it will be seen in that case the District of Columbia, like a railway company, in repairing the street was performing a legal duty which it owed to the public.

Many decisions are cited by the appellee, including decisions in cases against railway companies and also against individuals and companies operating manufacturing and other like establishments, to sustain the judgment upon the issues discussed above, such as Sherman S. & S. Ry. Co. v. Bridges, 16 Tex. Civ. App. 64, 40 S. W. 536, Weatherford v. Lowery, 47 S. W. 34; Pecos & N. T. Ry. Co. v. Bowman, 78 S. W. 22; San Antonio Edison Co. v. Beyer, 24 Tex. Civ. App. 145, 57 S. W. 851; Ft. Wayne Coop. Co. v. Page, 170 Ind. 585, 84 N. E. 145, 23 L. R. A. (N. S.) 946, and note; Wolf v. Des Moines Elevator Co., 126 Iowa, 659, 98 N. W. 301, 102 N. W. 517; Knight v. Goodyear's India Rubber Co., 38 Conn. 438, 9 Am. Rep. 406; Crocker v. McGregor, 76 Me. 282, 49 Am. Rep. 611; also Thompson on Negligence, vol. 1, §§ 1257, 1258.

In 1 R. C. L. bottom pages 1202 to 1206, is found a discussion of general principles with respect to the liability of owners of property abutting on a public highway for injuries resulting from the fright of animals driven upon the highway caused by the emission of steam, the blowing of whistles, etc., in the operation of machinery upon such abutting property, with numerous citations of authorities in support of the text. Among other authorities so cited is Cook v. Rice Lake Milling & Power Co., decided by the Supreme Court of Wisconsin, reported in 146 Wis. 535, 130 N. W. 953, 132 N. W. 346, 32 L. R. A. (N. S.) 1225, and in Ann. Cas. 1912C, 458, in connection with which latter report there is a note of numerous other decisions in cases of like character, in several of which as well as in the case to which the note is appended, it was held that the evidence was insufficient to support a finding of negligence authorizing a recovery. And the facts of some of those cases, at least, are quite similar to the case at bar; but in several other cases cited in the notes also involving facts of like character, a contrary conclusion was reached.

We shall not undertake to discuss those authorities at length. They are all based upon the same fundamental principles of the law of negligence upon which the present suit was made to hinge. Necessarily the facts of such cases differ, and the question, whether or not the facts relied on by the plaintiff in all such cases are sufficient to sustain a finding of negligence must be determined in the light of reason in connection with common experience.

[1-3] After a careful consideration we have reached the conclusion that the undisputed facts, considered in connection with the evidence recited above, were sufficient to sustain the findings of the jury upon issues Nos. 1, 2, and 3, and hence, the assignments addressed to those findings and to the refusal by the court of appellant's request for an instructed verdict are overruled, as are also other assignments presenting the contention that such findings of the jury are so contrary to the great weight of the evidence as to show manifest injustice.

[4] Complaint is made of the second special issue submitted to the jury in using the word "might," preceding the words, "probably cause horses of ordinary gentleness to take fright," etc., and in refusing the submission of a requested issue in the same language of issue No. 2, given with the exception that the word "would" was used instead of the word "might," in the connection above noted. Substantially, the contention is that the word "might" imports a mere possibility, rather than a probability, of the happening of an accident of the character in question; that liability would not attach if such an injury was only possible, but that it would attach only in the event that an injury of

that character would reasonably have been foreseen by a person of ordinary prudence, as expressed in the requested instruction.

In St. L. S. W. Ry. Co. v. Garber, 108 S. W. 742, in overruling an assignment to a charge that in estimating plaintiff's damages the jury should take into consideration such physical pain and mental anguish as plaintiff "may reasonably and probably suffer in the future as a result" of the injury, on the ground, substantially, that it allowed damages for possible rather than probable future suffering, the court said:

"It is difficult to perceive any real or substantial difference between the expression 'may reasonably and probably suffer' and 'will reasonably and probably suffer.'"

See, also, Garrett v. State, 49 Tex. Cr. R. 235, 91 S. W. 577, and several other decisions to the same effect noted in 3d Words and Phrases (2d Series) on pages 334, 335, and 382, among which are O'Keefe v. United Railways Co., St. Louis, 124 Mo. App. 613, 101 S. W. 1144, and several other Missouri decisions, and Louisville Ry. Co. v. Wellington, 137 Ky. 719, 126 S. W. 370, 128 S. W. 1077, in which it is held that the words "may" and "might" comprehend the idea of probability as well as the idea of possibility; and the words "may" and "might" are often used interchangeably in general discussions of the question of injuries as the result of negligence, for which one may be held liable, although the authorities here referred to had no reference to the question of proper instructions to a jury upon such an issue. See T. & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162; St. Louis, E. M. F. Co. v. Dawson, 30 Tex. Civ. App. 261, 70 S. W. 450.

In the instruction criticized it will be noted that the words "probably cause," etc., follow the word "might." And we are of the opinion that, especially when used in that connection, it is not likely that the jury construed the charge in the sense suggested in the assignments, which are, accordingly, overruled.

[5] There was no error in refusing to submit special issues requested by the defendants, requiring findings by the jury whether or not the Scott gin was constructed and operated, so far as the escape of steam in pressing cotton is concerned, in the usual and customary manner, and whether or not the noise and appearance of steam escaping from the exhaust pipe at the time of plaintiff's injury were usual and necessary incidents attending the operation of cotton gins at that time. We understand the law to be that the custom of persons engaged in the same business to perform work in a certain manner is admissible upon the issue of negligence, but it is not controlling; and it was shown without controversy that it was not necessary to the operation of the gin that the exhaust pipe should be constructed and placed as was the one in question, but that the waste steam could have been discharged into an excava-

tion in the ground or on the opposite side of the gin, without any serious impediment to the operations of the gin, and without any appreciable increase of expense, and that thereby the dangers from the noise and appearance of the steam would, to say the least, have been greatly diminished. Furthermore, the issues, Nos. 1, 2, and 3, submitted to the jury correctly covered the question of negligence in the construction and operation of the gin.

[6] Error has been assigned to the fourth special issue submitted to the jury upon the measure of damages, in that the jury was required to find the amount of damages in the aggregate, without making a specific finding upon each element of damages mentioned in that instruction. Appellants filed no request for an instruction to the jury to separate their findings so as to show the amount allowed on each particular issue of damages, and in the absence of such request, no reversible error is shown in the instruction given. Heiligmann v. Rose, 81 Tex. 222, 16 S. W. 931, 13 L. R. A. 272, 26 Am. St. Rep. 804, and other decisions there cited.

Nor can we say that, in the light of all the evidence with respect to the injuries sustained by the plaintiff, the verdict is so large as to show prejudice or bias on the part of the jury requiring a reversal of the judgment, as insisted in another assignment.

For the reasons indicated, all assignments of error are overruled, and the judgment is affirmed.

### On Motion for Rehearing.

By bill of exception taken by appellants to the paragraph of the court's charge submitting the issue of the measure of plaintiff's damages, the contention was made that the court should require a separate finding by the jury on each element of damages mentioned in the charge, and that the charge was erroneous, in that it required a finding by the jury of all such damages in an aggregate sum; attention being called in the bill of exception to the fact that in plaintiff's petition she had claimed $10,000 damages for physical pain and mental anguish; $4,750 for lost time and inability to work, and $250 for doctor's bills. In said objection to the charge appellants insisted that the jury should be instructed to make separate findings upon the elements of damages so itemized by the plaintiff.

[7] Appellants now insist that as the attention of the trial judge was thus specially directed to those matters in accordance with the present statutes governing in such cases, the old rule of decisions in force before the adoption of such statutes, requiring requested instructions calling the court's attention to such an omission in his charge, does not now obtain. And appellants insist, further, that the conclusion reached by us is in conflict with such decisions as H. & T. C. Ry. Co. v. Buchanan, 38 Tex. Civ. App. 165, 84 S. W. 1073, Q. A. & P. Ry. Co. v. Galloway, 154 S. W. 653, K. C., M. & O. Ry. Co. v. Worsham, 149 S. W. 755, to the effect, that a total failure to charge on the measure of damages, although merely an omission of duty on the part of the court, is reversible error, even in the absence of a requested instruction upon that issue. Even though it could be said that appellants are correct in their contention that under such circumstances a requested instruction is not necessary, yet the error, if any, would not require a reversal of the judgment, unless it appears that it was reasonably calculated to cause, and probably did cause, an improper judgment. Rule 62a, 149 S. W. x. The total amount of damages allowed by the jury was $8,500, and as that was far less than the aggregate amount claimed in the plaintiff's petition, it cannot be said that the jury allowed more than the aggregate amount sued for. Nor have appellants pointed out any testimony to show that the jury probably allowed an excessive amount upon any particular element of damages submitted, except to say that the amount that could have been allowed under the evidence for disability to labor, viewed in its most favorable aspect, would have been negligible only, and that the doctor's bill incurred in treatment of plaintiff for her injuries was less than $100, leaving the only item for which plaintiff reasonably could have been allowed damages that of physical and mental suffering. Plaintiff claimed $10,000 for the item of physical and mental suffering alone, and the evidence would justify a finding of great physical suffering sustained by her extending over a long period of time. In view of the entire record, we are unable to say that the omission in the charge complained of, if error at all, probably caused the rendition of an improper judgment.

Another contention is made that there was fundamental error in the judgment, in view of the absence of any specific finding of negligence which was the proximate cause of plaintiff's injuries. We do not think there is any merit in this contention, as the findings of the jury were essentially to that effect, as shown by the issues submitted and the findings thereon contained in our original opinion.

Accordingly, the motion for rehearing is overruled.