## LOUISVILLE & NASHVILLE R. R. CO. v. MRS. ELLA CHAMBERS, Admrx.

Middle Section.    May 15, 1928.

Petition for Certiorari denied by Supreme Court, December 22, 1928.

Ed. T. Seay, of Nashville, for plaintiff in error.
J. T. Baskerville, of Gallatin, for defendant in error.

OWEN, J. Louisville & Nashville Railroad Company, hereinafter called defendant, has appealed from a judgment rendered against it in the circuit court of Sumner county for the sum of $1500. The suit was originally brought by J. A. Chambers, as damages for personal injuries sustained by him by reason of his team taking fright at a passing freight train in the town of Gallatin, Tennessee, throwing him from his wagon and breaking his leg. After the institution of the suit the plaintiff died, not from the injuries resulting from falling from his wagon, but from other causes and the cause was revived in the plaintiff, his widow, and administratrix. The defendant at the close of plaintiff's proof moved for a directed verdict, which was overruled, the court being of the opinion that the railroad should explain the operation of its train, and stated that he would overrule the motion for the present. Thereupon the railroad company did not introduce any evidence, and the cause was submitted to the jury on the evidence of the plaintiff.

There were two counts to the declaration, a common-law count and a count based upon the failure of the railroad to observe subsection 3 of section 1574 of Shannon's Code. The suit of the plaintiff was

dismissed as to the second count, at the close of plaintiff's proof. The verdict is based alone on the first count.

The substance of the first count is as follows:

"That the plaintiff was a farmer, and about the 15th day of March, 1924, was hauling a load of cedar posts in a wagon drawn by a three-horse team, consisting of two horses and one mule, the mule being in the lead. Plaintiff alleges that he was travelling upon Railroad avenue in the town of Gallatin, and going with the said load of cedar to a point west of the railroad and railroad station. That as he approached the crossing he saw a train approaching from the north, going south, and stopped his team sixty or seventy feet from the railroad track until said south bound train passed. Thereafter, plaintiff was in the act of starting up his team when a freight train, coming from the south, going north, suddenly emerged from behind defendant's station house without giving any warning and emitting a large, unusual and unnecessary amount of steam, and doing an unusual and unnecessary amount of puffing, and making great, unusual and unnecessary noises, all of which badly frightened plaintiff's team and caused them to whirl around and break one of the wheels of plaintiff's wagon down, throwing him therefrom with great violence, causing plaintiff's leg to be broken and crushed and inflicting other injuries upon him."

The defendant filed a plea of not guilty.

The defendant seasonably filed a motion for a new trial which was overruled, prayed and perfected an appeal to this court and has assigned two errors, which raise the following proposition: That there is evidence to sustain the verdict of the jury and the court should have granted a motion for a directed verdict.

The sole question to be decided in this cause is whether or not there is any evidence showing negligence on the part of the defendant in the operation of its train which caused plaintiff's mule to take fright.

"A railroad company is not liable for injuries resulting from horses becoming frightened upon a highway at the mere sight of its trains or the noises necessarily incident to the running of trains and the operation of the road." Elliott on Railroads (3 Ed.), Vol. 3, section 1803 (1264); Hunt v. Southern Railway, 236 Federal, 157; L. & N. R. R. Co. v. Kelly (Ala.), 73 So., 953.

"The mere fact that a horse, shown to be gentle, may take fright at a noise incident to the operation of machinery, is not sufficient to raise a presumption of negligence." Daugherty v. Southern Cotton Oil Co. (Ark.), 211 S. W., 179, 4 A. L. R., 1341, 1342-3.

"The use of the words 'awful racket,' 'unusual noise,' 'terrible-to-do' and similar expressions in describing the noise made in the operation of a train are mere expletive or declamatory words or phrases and have no probative force in the way of proving negligence upon the part of a defendant charged with negligent operation of a train

across a public highway where it is claimed that the plaintiff's horse became frightened and threw plaintiff from the vehicle, causing personal injuries." Foley v. B. & M. R. R. (Mass.), 79 N. E., 765; 7 L. R. A. (N. S.) 1076, 1078; C. & O. Railway v. Hibbs (Va.), 128 S. E. 538, 24 Negligence Compensation Cases, Ann. 797, 805-806.

"A plaintiff who undertakes to maintain a cause of action grounded upon negligence of a defendant causing personal injuries to plaintiff, has the burden of proving negligence, and negligence is not presumed from the mere happening of the injuries." Railroad v. Cavell, 135 Tenn., 462; DeGlopper v. Railroad, 123 Tenn., 633; Railroad v. Lindamood, 111 Tenn., 457.

It appears that the defendant's railroad runs through the town of Gallatin in a general direction of north and south or rather a little northeast and a little southwest. The street which the railroad crosses near its depot is known as Railroad avenue and runs in the general direction of east and west.

The depot buildings are on the east side of the railroad and front on Railroad avenue with a frontage of about sixty feet. On the day of the accident Chambers was driving a three horse team. He had come from his farm east of Gallatin and was going in a westerly direction and expected to cross defendant's railroad. He had two horses, or a horse and a mule to his wagon, with a wagon tongue between the two animals and a mule was hitched at the end of the tongue. The plaintiff was seated upon his wagon, which was loaded with cedar posts. When he got within some sixty or sixty-five feet of the railroad tracks a freight train was going south. Whether his team ever saw the engine to this freight train does not appear. The plaintiff stopped his team and about the time the freight train cleared the crossing at Railroad avenue, the plaintiff was just about to start his team west a long freight train approached from the south, going north. This freight train had been hidden from view of the plaintiff and certain by-standers and other citizens, who were witnesses in this cause, on account of the length and height of the depot buildings. It appears that these buildings are about 300 feet long and parallel with the railroad tracks. When the engine pulling the long train came in view, the lead mule, or the one nearest the railroad track suddenly whirled to the north and ran around towards the driver who was seated on the front part of his wagon, and in so doing the right hand front wheel of the wagon was broken down, or was crushed, and the driver, the plaintiff, was thrown to the street and his leg was broken and he received other bruises. It appears that the two mules nearest the wheels of the wagon did not become frightened. There was another team near plaintiff's team, the driver of which testified that his team did not become frightened, although it appears that he took extra precaution to control them as he stated that his team was afraid of trains.

The substance of plaintiff's evidence in regard to how the accident happened is as follows:

Will Chenault testified that:

"The first thing I noticed was a train coming from behind the depot and it scared his team. The horses didn't seem to be scared but just the mule broke around."

"Q. At the time the train ran out from there, just describe whether or not the train blew or was the bell ringing? A. I didn't notice it blow or ring the bell, it was pulling awful hard like it had an awful load and puffing and smoking. The smoke blowed every which way and the team broke and run.

"Q. You say it was pulling hard and emitting a great deal of smoke? A. Yes sir.

"Q. Did that attract your attention? A. Yes sir, as soon as it broke out, it kind of frightened me for a second and the team broke and I began to watch the old man and his team."

Further on this witness stated that the engine was pulling mighty hard and making about as much noise as I ever heard an engine make. On cross-examination the witness testified:

"Q. You say when that train came out from behind the depot it was making a noise like trains make, wasn't it? A. Well, yes sir, it was pulling awfully heavy, like it was mightily heavy loaded and attracted my attention.

"Q. Heavy enough to have two engines, they must have had a pretty good load? A. I can't say how many engines."

The witness, S. A. Tucker, testified that the train was making an awful racket. He was asked to describe to the court and jury what the racket consisted of and what was the racket from. He answered from puffing and steam popping off and smoke. On cross-examination this witness said that the engine was making an unusual noise, he thought. He testified that the train was coming tolerably fast.

J. E. Johnson testified that he was going east, walking. He stopped on account of the train that was going south. That he could not see the north bound train until the south bound train passed where the witness was standing. Before he could cross the railroad tracks the north bound train came. He described the approach of the train by testifying: "I heard it make a terrible to-do. I reckon it must have been the steam cocks." He further testified that it was an awful long train and he would consider it a heavy train, but this witness could not tell how many cars the engine was pulling. He did not pay any attention to the number of cars, but he knew it was a long train.

Practically all of the witnesses were asked if this train had two engines, on cross-examination, but none were able to relate whether there were more than one engine or not.

Adolphus Gregory testified as follows:

"Q. What attracted your attention, what about this train attracted your attention, the train going north? A. I don't know, the puffing of the train coming out there from behind the depot, coming up there on the track.

"Q. Did it make much noise, or not? A. Well, I don't know that it made any more noise than the usual train.

"Q. I asked you did it make much noise, what kind of noise did it make? A. Puffing, exhausting.

"Q. Much smoke? A. No sir, not any more smoke than ordinary trains that I know of, I didn't pay any attention to the smoke.

"Q. You were a little back? A. Yes sir, I was right where I could see by the side of the depot."

This witness is the one who was driving a team and who testified: "I took my wagon and team between the depot and restaurant. One of my mules was afraid of the train and I put it back in there where he could not see the train."

Burton Burkett testified that he was near the plaintiff's wagon at the time of the accident, that he had seen the train go south; that he thought the train was gone; that he turned to look again and mules had broke and turned around to plaintiff's wagon; that a train popped out from behind the buildings unexpected. He further testified that it seemed to him like it was making an awful noise. This opinion of the witness was objected to but the court said that was the way the witness had of describing the train.

He further testified in describing the noise that it was more noise than he had ever paid any attention to by a train around the depot.

Learned counsel for the defendant insist that:

"These expressions were merely expletive or declamatory words or phrases as descriptive of the noise made by a train and are not accompanied by any evidence capable of conveying to the ordinary mind a definite conception of what the facts were. Such expressions do not rise to the dignity of evidence. They have no probative force. They present no issue which the defendant could meet. In other words, how could the defendant disprove the statement of the witness who said the train was making a 'terrible-to-do?' Or the statement of the witness that the train was making an 'awful racket'; or the statement of the witness that it was 'making more noise than he ever heard a train make?' Every one of these statements might have been made by a witness in undertaking to describe what would have a perfectly normal, careful and prudent operation of a train. There is no evidence that there was anything wrong with the machinery of this train. The uncontradicted proof shows that it was an unusually long train, a heavy train; that it was pulling hard, and, under these conditions, the court must know, a train, cannot be operated without making a noise, puffing, emitting smoke and steam, and making what

many might term an 'awful racket,' a 'terrible-to-do,' 'more noise than they ever heard.' ''

It appears that none of the witnesses knew of the approach of this train going north until plaintiff's mule became frightened. The train apparently came silently, stealthly until the engine came out from behind the depot building. The proof indicates that on the day of the accident, which was in the month of March, that it was very windy and that this condition of the atmosphere had something to do with the blowing of the smoke.

''A railroad company is not liable for injuries resulting from horses becoming frightened upon a highway at the mere sight of its trains or the noises necessarily incident to the running of trains and the operation of the road. . . . Although a railroad company is not liable, under ordinary circumstances, for the fright of horses caused by the operation of its road in the usual manner, it is liable for frightening horses and causing injury by unnecessary and excessive whistling or letting off steam under such circumstances as to constitute negligence or wilfulness. . . . The mere sounding of a whistle, or the like, even at a place of extraordinary danger where horses are likely to be present, is not necessarily actionable negligence per se.'' Elliott on Railroads, (3d Ed.) Volume 3, Section 1803.

In Mitchell v. Railroad, 100 Tenn., 329 it was held that a presumption of negligence arises from the blowing of a locomotive whistle loudly and repeatedly under a bridge constantly used by all kinds of vehicles. It was held in that case that the blowing of a whistle under the bridge in the absence of some special necessity therefor was an unnatural and reckless act, liable to cause great damage, and the circumstances and surroundings call, therefore, for proof of its necessity when the act occasions the damage to be anticipated. The proof of such a blowing under such circumstances is sufficient to authorize the presumption of negligence. The onus is shifted, to explain and justify or excuse it, upon him who does it. This burden may be successfully carried, but it cannot be avoided by demurrer to plaintiff's evidence establishing the act.

''In the case of Louisville & N. R. Co. v. Kelly (Ala.), 73 So. 953 (1916) it appeared that while the plaintiff was driving a horse and buggy upon a public highway at the place where it crossed under the tracks of the defendant railroad company, a train passed over, and the horse became frightened when the engine suddenly emitted large quantities of steam which came down through the trestle work and enveloped the horse and conveyance. The animal ran away and the plaintiff was thrown from the buggy and injured. In her action to recover damages, it appeared that while there was no immediate necessity for the engineer to permit the engine to emit steam at that place, he did so without knowledge of the presence of the horse and

buggy. There was therefore no contention that the action of the engineer was reckless or wanton. The court accordingly held, in reversing a judgment for the plaintiff, that in the absence of proof of wantonness or recklessness, or of discovered peril, the emission of steam under the circumstances was not negligence, and the trial court should have refused to submit the case to the jury upon that issue."

In Hurt v. Southern Railway Co., 236 Fed., 157, a recovery was sought against the railroad company for damages sustained by the plaintiff by reason of the horse which he was driving on the highway taking fright, turning the buggy over, and causing the injuries of which the plaintiff complained.

In this case, at the close of the plaintiff's testimony, the defendant moved for a directed verdict, which motion the court sustained. Says the court at page 159:

"It appears to me clearly from the testimony of Mrs. Hunt that the horse was frightened at the smoke of a switch engine which was being operated under or near the bridge; and, assuming without deciding that under the allegations of the complaint, which makes no reference to smoke thus caused, the plaintiff can rely upon that as an act of negligence, I am clearly of the opinion that under the South Carolina decisions, the emission of smoke under the circumstances being the cause of the fright of the horse and itself not being an act of negligence, the fright of the horse, and not the defect in the construction of the approach to the bridge (the absence of barriers), was the proximate cause of the injury."

In Foley v. Boston & Main Railroad (Mass.), 79 N. E. 765, 7 L. R. A. (N. S.) 1076, the plaintiff was injured by being thrown from a moving train while it was passing over a cross-over switch at a point where repairs were in progress on the railroad. The testimony tended to show that at this cross-over switch the jar of the train was awful, and terrible, which caused him to lose his support, and a fellow passenger lurched against him, throwing him out of the car and off the platform. The court in this opinion said:

"There is nothing to show that the jar in question resulted from any negligent act on the part of the defendant, either as to speed or construction of car or track. It is true that the speed was described as 'swift', and the jar or lurch as 'quite violent,' 'terrible,' 'awful,' 'very severe,' and 'unexpected.' Mere expletive or declamatory words or phrases as descriptive of speed, or acts unaccompanied by any evidence capable of conveying to the ordinary mind some definite conception of a specific physical fact, and depending generally upon the degree of nervous emotion, exuberance of diction, and volatility of imagination of the witness, and not upon his capacity to reproduce by language a true picture of a past event, are of slight, if, indeed, they are of any, assistance in determining the real character of the fact respecting which they are used."

Learned counsel for the plaintiff cites numerous authorities in support of the principle of law that it is for the jury to determine whether or not the particular act was necessary to the proper operation of the train at the time and place.

In Railroad v. Sawyer, 114 Tenn., 84, it was said:

"After an examination of all the authorities cited, we think the true rule deducible therefrom, is, that if the place is dangerous, then the company is onerated with the duty of warning travelers on a highway of the approach of its trains, but whether the place, as a matter of fact, is dangerous, is a question for the determination of the jury."

In the case of Beopple v. Railroad, 104 Tenn., 420, which involved the liability of the railroad for frightening a team, which ran away and caused plaintiff personal injuries, a demurrer had been sustained to the plaintiff's declaration in the lower court. This was reversed by the Supreme Court. Mr. Justice Caldwell, for the court said:

"It is not essential to aver that the whistling of a train was 'needlessly, wantonly, and wrongfully' done, in order to render the defendant company liable for injury resulting therefrom. An averment that defendant wrongfully caused great and unnecessary noise at a crossing, that caused the injury, is sufficient."

The case of L. & N. Railroad v. Comley, 173 Ky., 469, was cited by plaintiff. There was a recovery by the plaintiff, who was driving a team, which ran away. The negligence consisted of the back ringing of a signal bell, which rang after the plaintiff's team got upon the railroad track and some time after the train had passed. It was shown that there was no necessity for this back ringing, and that the signal rang because it was out of repair.

Another case relied upon by plaintiff is Omaha Railroad Company v. Brady, 39 Neb., 27. In that case the Supreme Court was divided upon the question of liability, but the majority of the court said:

"Railroads cannot be operated without noise, and if teams are frightened by the usual noise arising from a prudent and proper management of a train or engine the railroad company is not liable for an injury resulting from such noise. The making of an unnecessary noise by a railroad company—as, in this case, the escaping of steam—is not of itself evidence of negligence. It may or may not be. To be negligence, the noise must have been made under such circumstances and surroundings as to time, place, and situation of the parties as to establish a neglect to exercise that degree of care which a reasonable man would have exercised under the circumstances."

The court further said: "If the verdict depended for its support on the alleged negligence of the railroad company's engineers opening the valves of the engine, and unnecessarily permitting the escape of steam therefrom, it could not stand, but that the proximate cause of plaintiff's injury was the negligent flooring of the railroad crossing,

and when plaintiff's vehicle struck this bad crossing, he was thrown from his vehicle; and that the verdict could properly stand upon the negligence of the defendant in maintaining a crossing where plaintiff was injured.''

In the instant case we have a long train. It could not be pulled by an engine without the engine making some noise. Railroad engines have to emit smoke. They have to puff. They have to emit steam at certain times. Just what frightened plaintiff's mule on this occasion is mere conjecture. Was it the steam? Was it the smoke? Was it the puffing of the engine? Or was it simply the sight of the engine as it came towards the mule, that made the mule whirl around, so as to not look at the engine as it went by.

Taking the evidence of the plaintiff as true, and the description of the plaintiff's witness as they described the engine as it went by we cannot find any evidence of negligence. There is not the slightest evidence that the engineer ever saw the plaintiff before the mule whirled. There is no insistence that there was any discovered peril. What did the operator of the engine do that he should not have done in passing through Gallatin on the day of the accident?

Negligence cannot be presumed. It must be proven and we fail to find any negligent act on the part of the defendant in the operation of its train and by such operation it caused plaintiff's mule to take fright. It results that the assignments of error are sustained and the judgment of the lower court is reversed. Plaintiff's suit is dismissed at plaintiff's cost.

Heiskell and Senter, JJ., concur.